Jeffrey D. Harris (SBN AZ 031136)
Annabel Barraza (SBN AZ 037108)
STINSON LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004
Telephone: 602.279.1600
jeff.harris@stinson.com
annabel.barraza@stinson.com

*Attorneys for Plaintiff K.W. Brock Directories, Inc.*
 *aka Names and Numbers*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| K.W. Brock Directories, Inc. aka Names and Numbers, a Kansas corporation,<br><br>                         Plaintiff,<br><br>        v.<br><br>Arvig Enterprises, Inc. dba Arvig Media, a Minnesota corporation; Cydni Beck aka Cyd Beck and Doe Beck, a married couple,<br><br>                         Defendants. | Case No.<br><br><br>**VERIFIED COMPLAINT** |

Plaintiff K.W. Brock Directories, Inc. aka Names and Numbers ("Names and Numbers" or, at times, the "Company") alleges as follows:

## PARTIES

1.      Names and Numbers is a Kansas corporation conducting business in, among other places, Coconino County, Gila County, Graham County, Greenlee County, Mohave County, and Yavapai County, Arizona.

2.      Defendant Arvig Enterprises, Inc. dba Arvig Media ("Arvig Media") is a Minnesota corporation conducting business in, upon information and belief, Coconino County, Gila County, Graham County, Greenlee County, Mohave County, and Yavapai

County, Arizona.

3.    Defendants Cydni Beck aka Cyd Beck ("Ms. Beck" or, at times, "Employee") and Doe Beck, a married couple (collectively, Ms. Beck and Doe Beck are the "Becks") (Arvig Media and the Becks are at times, collectively, "Defendants"), are Arizona residents. Ms. Beck has taken actions on behalf of business entities in, among other places, the State of Arizona. Upon information and belief, the Becks are a couple who were legally married at all times relevant hereto. Doe Beck is named herein only to bind the Becks' marital community.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.    This Court has personal jurisdiction over the parties in this lawsuit.

6.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

7.    Names and Numbers publishes local business directories in the U.S. and Canada.

8.    Names and Numbers advertises online that its mission "is to connect buyers and sellers through [its] print, digital and mobile products" and that, since 1974, its "job has been to bring your business more business."

9.    Names and Numbers offers its customers, among other things, both online and printed advertising, such as in the following ad on its website:



10.    Arvig Media is a business competitor of Names and Numbers.

11.    Among other offerings, Arvig Media also offers print and online

advertising for local businesses, such as in the following ad on its website:

**Digital Display Ads**

Advertise your business on the web sites your customers visit. Target your local consumer and build a stronger brand for your business. We can get your message in front of the right consumer with a display ad that is continuously optimized. The ads we'd help you with are targeting where your consumers are searching online.

Learn More

12.     Names and Numbers hired Ms. Beck as a salesperson on October 21, 2022.

13.     To memorialize the terms of Ms. Beck's employment, Names and Numbers prepared and presented Ms. Beck with a Salesperson Employment Contract (hereinafter, the "Employment Contract" or, at times, the "Agreement"), which Names and Numbers and Ms. Beck executed on or about October 21, 2022. Attached hereto as **Exhibit A** is a true and correct copy of the Employment Contract.

14.     The Employment Contract's recitals expressly provide as follows:

The Company is in a highly competitive business and expends a considerable amount of time, effort, and money in the development of business from new clients and customers, and in obtaining continued business from existing clients and customers.

The Company has also developed and acquired for use certain commercially valuable information, technology, and business methods that are not generally available to or known by the public.

The continued growth and success of the Company depends on its ability to maintain its competitive edge, and not only requires the protection of its existing proprietary information

and technology, but also the generation of new proprietary information, technology and business methods. The Employee understands that the basis of the success of the Company resides in its employees, and is dependent upon the protection of its proprietary information, technology and business methods.

15.    Paragraph 1 of the Employment Contract ("Duties of Employee") states, among other things:

Employee hereby agrees to diligently and faithfully perform all duties required as a salesperson for Company.

The Employee's duties include but are not limited to the following:

a.    To solicit, secure, and maintain for Company local business directories and digital products advertising contracts.

b.    To complete and forward all contracts, copy sheets with appropriate art, etc. for local business directories and digital products advertising on forms as provided by Company.

c.    To devote best efforts exclusively in furtherance of Company's business on a full time basis, and not to represent any other company without the specific prior written permission of Company.

[…]

e.    To faithfully and diligently discharge all other duties assigned by Company.

f.    To actively attend to the business needs of Company's customers within the territory assigned by Company and to attract and obtain new customers within said territory for Company. . . .

16.    Paragraph 7 of the Employment Contract ("Non-Disclosure of Information") states, among other things:

> Employee may have access to trade secrets, confidential and/or proprietary information of the Company, including but not limited to all information used by or belonging to or relating to the Company or any subsidiary, parent or affiliate of the Company which is not generally known to the public or to the industry in which the Company is or may become engaged, including, without limitation, past, present or future business or trade secrets, customers or customer lists, prospects or prospect lists, price lists, cost lists, methods, policies, formulas, procedures, know-how, manuals, handbooks, instructions, techniques, business strategies, marketing or development plans, devices, records, drawings, demonstrations, samples, models, blueprints, reports, specifications, designs, technology and digital products, computer hardware and software, key employees, financial or proprietary information and all other information, knowledge or data of any kind or character relating to the products or business of the Company or any subsidiary, parent or affiliate of the Company whether or not reduced to writing, which should be treated as confidential information, and all copies and duplications thereof ("Confidential Information"), some of which the Company may have licensed or otherwise acquired from third parties. Employee agrees that upon termination of employment with the Company for any reason whatsoever, whether voluntary or involuntary, or whenever the Company shall request, he or she will promptly deliver to the Company all Confidential Information in his or her possession or under his or her control, and will not retain copies thereof. In addition, Employee agrees to treat all Confidential Information as confidential and will not during the term of employment or at any time subsequent to the termination of employment communicate or disclose to any person or entity, other than the Company, nor duplicate or use for any reason or purpose, either for the benefit of Employee or for the benefit of any person or entity, other than for the benefit of the Company, any Confidential Information. Employee further agrees to use best efforts at all times to safeguard any Confidential Information from falling into the hands of any

unauthorized person or entity. . . .

17. Paragraph 8 of the Employment Contract ("Non-Solicitation and Non-Disclosure") states, among other things:

> For a period commencing on the date of this Agreement, continuing for a period of 24 months following the termination of Employee's employment or association with the Company for any reason whatsoever, whether voluntary or involuntary, Employee will not, directly or indirectly, or as an employee, officer, director, member, owner, stockholder (except for ownership in a company whose stock is actively traded on a national public exchange), agent, consultant, lender, or affiliate of such entity or otherwise:
>
> > a. Solicit, accept, or service, or attempt to solicit, accept or service, any business similar to the type and character of business then engaged in by the Company from any person, corporation or other entity who is then or during the term of employment was a customer or independent contractor of the Company . . . .

18. Paragraph 9 of the Employment Contract ("Covenant Not to Compete") states, in full:

> For a period of two years after termination of employment for any reason whatsoever, whether voluntary or involuntary, Employee hereby agrees that he or she will not, within any area covered by a local business directory (print and online) published by Company, and a radius of twenty-five (25) miles beyond such areas:
>
> > A. Own, operate, engage in, or cause to be operated or engaged in directly, indirectly or through others any Competitive Business; or
> >
> > B. Disseminate or cause to be disseminated advertising material related to any Competitive Business; or

C. Become interested in, directly or indirectly, as an employee partner, officer, director, stockholder, advisor, consultant, agent, independent contractor or any other form, method, or capacity, any Competitive Business; or

D. Shall not disparage, hold in disrepute, or otherwise speak or refer in negative terms about Employer.

For purposes of this Agreement, a "Competitive Business" means any business activity which involves or relates to publication of print or online local business directories and digital products, or solicitation of advertising therein, or which otherwise competes directly or indirectly with the business activities of Company.

The Employee represents that his or her experience, age, capabilities, health and personal assets are such that this covenant will not deprive Employee from either earning livelihood in the unrestricted business activities or from otherwise adequately and appropriately supporting himself or herself.

The parties further agree that the time period of this covenant and the geographic area covered are terms and conditions which are reasonable and necessary for the protection of the business activities and valuable property rights of Company.

19.     Paragraph 10 of the Employment Contract ("Disclosure of Agreement") states, in full: "Employee agrees to provide a copy of this Agreement any prospective future employer prior to accepting employment with any such employer."

20.     Paragraph 11 of the Employment Contract ("Remedies") states, in full:

The Company may enforce the terms of this Agreement by instituting legal or equitable action. Employee understands and agrees that in the event of a breach or threatened breach of any provision of this Agreement, the Company may suffer irreparable damages and its remedy at law will be inadequate. Therefore, upon any such breach or threatened breach by

Employee, the Company shall be entitled to injunctive relief. Moreover, if the Company prevails against Employee, in whole or in part, in any action to enforce this Agreement, whether for injunctive relief or damages or both, then in addition to whatever injunctive relief or damages may be awarded, Company shall be entitled to all costs and expenses, including reasonable attorney fees and expert witness fees, incurred in connection with any dispute hereunder, whether or not formal litigation is commenced; and Employee shall be liable for such costs and expenses.It is further agreed that in the event a court of competent jurisdiction determines that Employee has breached any obligations under paragraphs 7, 8, or 9, the expiration date of the covenants herein shall be extended by a day for each day the covenant(s) herein have been breached.

21.   Paragraph 13 of the Employment Contract ("Severability") states, in full:

The invalidity or unenforceability of any part or subpart of this Agreement shall not affect the validity or enforceability of the remainder of the Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed, by limiting or reducing it, so as to be enforceable to the maximum extent in favor of the Company that is lawfully enforceable.

22.   Paragraph 16 of the Employment Contract ("Applicable Law") states, in full:

This Agreement is deemed to be entered into in Pittsburg, Kansas and shall be construed pursuant to and governed by the laws of the State of Kansas. The parties agree that jurisdiction and venue in any action brought pursuant to this Agreement to enforce its terms shall properly lie in the District Court of Crawford County, Kansas. Such jurisdiction and venue is merely permissive; jurisdiction and venue shall also continue to lie in any court where jurisdiction and venue would otherwise be proper.

23.     In or around July 2025, Names and Numbers became aware that Ms. Beck was employed by Arvig Media while she was employed by Names and Numbers, in violation of, at a minimum, Paragraphs 1(c), 8, and 9 of the Employment Contract and the spirit and purpose of the Employment Contract as outlined in its recitals.

24.     Around that same time, Names and Numbers became aware that Ms. Beck was:

a.     using Names and Numbers' list of current customers to create business opportunities for its direct competitor, Arvig Media, and to enrich herself at Names and Numbers' detriment, by diverting Names and Numbers' customers to Arvig Media, for which Ms. Beck was compensated by Arvig Media;

b.     upon information and belief, using Names and Numbers' list of potential customers to do the same;

c.     contacting current and/or potential customers of Names and Numbers in her capacity as both an employee of Names and Numbers and of Arvig Media;

d.     upon information and belief, communicating negative and derogatory or otherwise defamatory statements about Names and Numbers to Names and Numbers' current and/or potential customers so as to divert the customers' business away from Names and Numbers and instead toward Arvig Media, thereby enriching Arvig Media and herself with no justification; and

e.     falsely representing, negligently representing, and/or purposefully omitting material information to Names and Numbers' current and/or potential customers during Ms. Beck's communications with them (whether in-person, on the phone, or online) that they would be signing a contract with Names and Numbers when they were, in fact, signing a contract with Arvig Media, such as by, without limitation,

not giving the current or potential customer the full truth of what Ms. Beck's intentions were for conducting business with them and/or by physically obscuring the name of the business on the proposed contract.

25.     Upon learning this information, Names and Numbers' president, Todd McKnight, called Ms. Beck to learn if this was true (she confirmed it was); if so, why Ms. Beck was acting in such a harmful way (she did not see what she was doing as problematic); and to inform Ms. Beck that such actions were in violation of the spirit and letter of the Employment Contract and were otherwise unacceptable.

26.     On July 22, 2025, Ms. Beck sent an email with the subject "Resignation" to Names and Numbers' president, Todd McKnight, and its owner, Debbie Brock, a complete copy of which is attached as **Exhibit B**, wherein she admitted that she was competing with Names and Numbers through Arvig but stated, "I don't see the big deal here."

27.     The following day, July 23, Names and Numbers, via Mr. McKnight, responded to Ms. Beck's email with his own email, a copy of which is attached as **Exhibit C**, as follows:

> Cyd,
>
> We are responding to your resignation email of yesterday, July 22nd, 2025.  Names and Numbers ("N&N") accepts your resignation.
>
> When we learned that you have been selling print advertising for Arvig to N&N customers for a number of weeks and shared this with Debbie we were both shocked, disappointed and in disbelief.  This is a direct violation of your employment contract with N&N, a copy of which is attached.  Paragraph 1 (c) provides in part that you have a duty "To devote best efforts exclusively in furtherance of Company's business on a full-time basis, and not to represent any other company without the specific prior written permission of Company."  Further, please

refer to Paragraph 8, which prohibits you from soliciting business from any N&N customer on behalf of a competitive business. Paragraph 9, moreover, prohibits you from working on behalf of a competitive business during your employment at N&N and for two years thereafter. Your conduct violates all of these restrictions.

These restrictions are fully enforceable, and N&N intends to enforce them. This means you would be subject to an injunction prohibiting violation of these provisions and potential liability for damages caused to N&N by your breach of contract conduct. It also appears that you have misled the N&N customers upon whom you have called on behalf of Arvig, causing them to believe they were renewing advertising with N&N. This action also exposes you to potential civil liability for the damage caused by your conduct.

If you would like to avoid litigation over this matter, N&N expects that you will do the following:

1.    First, submit immediately to N&N a list of all N&N customers to whom you have sold advertising for Arvig in any market, along with a copy of the contract the customer signed, the business name, address and phone number. N&N expects to receive this information by Thursday July 24th 2025 by 5:00pm CST.

2.    Second, you must honor your contract with N&N and, effective immediately and continuing for two years as provided in your contract, cease and desist from selling phone book advertising, print or digital, and online digital products for any other publisher within any area covered by N&N and within 25 miles thereof.

3.    In addition, you must return all N&N contracts and other documents, the iPad and power cord and other N&N property by Friday July 25th, 2025 5:00pm CST. You may use N&N's Fed Ex account for this purpose.

N&N regards your violation of your contract as a very serious matter for which it intends to pursue its legal remedies if you do not comply with the requirements in this email. We trust you will proceed in a manner consistent with this information.

We will mail you a letter stating the same information in this email via certified mail.

Thank you for your immediate and serious attention to this matter.
Todd McKnight, President
Names and Numbers

28.    Ms. Beck took no action to timely address Nos. 1 and 3 from the letter in Paragraph 27 immediately above.

29.    The day after that, on July 24, counsel for Names and Numbers sent a letter, a copy of which is attached as **Exhibit D**, to Arvig Media's Director of Business Development and Sales, Ms. Beck Schornack, and its Sales Manager, Rich Richter, stating, among other things:

Dear Mr. Schornack and Mr. Richter:

In addition to the matters stated in my letter to you of May 22, 2025, N&N has now learned that its employee, Cyd Beck, has been for some time violating her employment agreement with N&N by also selling print advertising for Arvig. This is a direct violation of her contract with N&N, a copy of which is attached. Paragraph 1 (c) provides in part that Ms. Beck has a duty "To devote best efforts exclusively in furtherance of Company's business on a fulltime basis, and not to represent any other company without the specific prior written permission of Company." No such permission was requested or given. Further, Paragraph 8 prohibits her from soliciting business from any N&N customer on behalf of a competitive business, which of course Arvig is. Paragraph 9, moreover, prohibits Ms. Beck from working on behalf of a competitive business during her employment at N&N and for two years

thereafter. These restrictions are fully enforceable under Kansas law, which is applicable to Ms. Beck's contract and employment at N&N and N&N fully intends to enforce them. N&N customers have reported that Ms. Beck, further, has misled N&N customers upon whom she has called on behalf of Arvig, causing them to believe they were renewing advertising with N&N. This conduct constitutes trade libel and unfair competition.

These facts support an allegation that Arvig has intentionally interfered with the contract between Ms. Beck and N&N. *See Reebles v. Bank of America, N.A.*, 25 P.3d 871 (Kan. App. 2001). It is obvious that Arvig knew that she was a N&N rep and that Arvig would have known that she had an employment contract with N&N. If it claims not to have had such knowledge, it can only be because it purposely avoided asking Ms. Beck if she had such a contract and any restrictive covenants. Given the competitive nature of the phone book advertising business, it is credulous to suggest that Arvig was not on notice that she may have such a contract and restrictions. All N&N reps have employment contracts with restrictive covenants.

Ms. Beck has sold an undetermined number of N&N customers the Arvig print directory. She may be continuing to do so at this writing. N&N has suffered damages as a result of her breach of contract activity, and as a result of Arvig's interference in N&N's contract with Ms. Beck. N&N intends to hold Ms. Beck and Arvig responsible for all resulting damages. In Arvig's case, the circumstances with Ms. Beck follow the misleading information Arvig reps have related to N&N customers, as stated in my earlier letter.

N&N demands that Arvig immediately and permanently cease and desist from allowing any of its sales reps to propound false information about N&N to customers or potential customers, to prohibit Ms. Beck from continuing her employment with Arvig in violation of her contract and to reject any advertising contracts obtained by her from N&N customers. Please acknowledge within three business days that Arvig will conform to the foregoing demands, failing which N&N will

resort to its legal remedies.

Thank you.

30.    Names and Numbers received no response to that letter from Arvig Media.

31.    About one week later, on July 30, 2025, Mr. McKnight again wrote an email to Ms. Beck, a copy of which is attached as **Exhibit E**, stating, in full:

> Cyd,
>
> Thank you for returning the company property and the N&N advertiser contracts you had on hand—we appreciate your cooperation on that matter.
>
> However, we have not yet received:
>
> A list of N&N customers to whom you have sold Arvig contracts (which would be a direct violation of your employment agreement), and
>
> Your written assurance that you will immediately cease all selling activity for Arvig within N&N markets.
>
> We want to resolve this matter without escalating it legally. However, if we do not receive both the customer list and your assurance immediately, N&N will have no choice but to proceed with legal action. We are already retaining an Arizona attorney and will seek an injunction against your continuing violation of the restrictions in your employment agreement as well as monetary damages as permitted under the terms of your employment agreement.
>
> This situation can still be resolved amicably. If you intend to send us the customer list and honor your contractual obligations, please contact me immediately to confirm.
>
> Sincerely,
> Todd McKnight, President
> Names and Numbers

32.    Despite the repeated, professional, amicable, and clear communications from Names and Numbers to Ms. Beck and Arvig Media, neither Ms. Beck nor Arvig Media has shown any willingness to discontinue their tortious, illegal, and/or contractually-prohibited activities.

33.    Rather, Ms. Beck continues to contact Names and Numbers' current and potential customers to divert their business to Arvig Media, thereby enriching Arvig Media and herself at Names and Numbers' expense.

34.    Upon information and belief—which is supported by multiple circumstantial facts such as the uncharacteristically cold, negative, or avoidant reactions Names and Numbers' previously-loyal customers now have toward Names and Numbers—Ms. Beck has been communicating negatively about Names and Numbers to Names and Numbers' own current and potential customers, thereby diverting their business away from Names and Numbers and instead toward Arvig Media.

35.    Since Mr. McKnight's July 30 email, Names and Numbers has further learned that Ms. Beck emailed an employment agreement like hers (apparently, she misplaced hers) with Names and Numbers to Arvig Media about 10 weeks ago when Names and Numbers began revisiting customer renewals in the Lake Havasu market, and that Ms. Beck does have an Arvig Media email address in addition to her personal one.

36.    Upon information and belief, Arvig Media reviewed the Employment Contract or an agreement similar to it that Ms. Beck sent Arvig Media and both (A) decided that it was not unlawful, tortious, or in breach of a written contract for Ms. Beck and Arvig Media to attempt to convert Names and Numbers' current and/or potential customers to Arvig Media for the enrichment of Arvig Media and Ms. Beck, and (B) advised Ms. Beck accordingly.

37.    Moreover, since the July 30 email, Names and Numbers has uncovered emails from Ms. Beck's Names and Numbers' email address to Names and Numbers' customers—from as early as February 2025—stating, among other things, that: (1)

Arvig purchased Names and Numbers, then sending the Names and Numbers customer an Arvig Media contract for them to sign; (2) Names and Numbers is solely digital but that Arvig Media will handle print and characterizing it as "just rebranding"; (3) Ms. Beck is leaving Names and Numbers and that she will further communicate with them through an Arvig Media email; and (4) "Your print is with Arvig and your digital is with Names and Numbers."

38.    Names and Numbers has been developing and moving forward with plans, that have been in place since January 2025, to continue its business growth in the State of Arizona by contacting and selling to current and potential customers, such as in Maricopa County, Lake Havasu, and Prescott.

39.    The Becks reside in Prescott, and Ms. Beck has already been contacting current and potential customers of Names and Numbers there in her efforts to divert business from Names and Numbers to Arvig Media.

40.    Names and Numbers' customers in Prescott amount to approximately half of the Names and Numbers' market in the State of Arizona; their contracts total nearly $200,000.

41.    Names and Numbers is already attempting to mitigate the damage caused by Ms. Beck's actions, such as by contacting its own customers, but it is proving to be difficult to get customers to answer their calls or return calls.

42.    Names and Numbers recently learned that Ms. Beck was actively selling in Lake Havasu just days ago.

43.    Ms. Beck is now seeing Names and Numbers customers that she does not have contracts for. She has information about them because of her time at Names and Numbers.

44.    Names and Numbers has confirmed that many of its customers have been contracted by Ms. Beck and their business has been diverted away from Names and Numbers and toward Arvig Media and Ms. Beck.

45.    The names of these customers are not printed in this public pleading

because they constitute Confidential Information, but Names and Numbers is willing to share their identities with the Court on an in camera, ex parte review (i.e., not as part of the public record) so that Arvig Media and Ms. Beck cannot profit further from their business. These businesses include, but are not limited to:

a. Customer A: Ms. Beck cancelled the $17,000 contract on June 26, 2025 and submitted the cancelled contract to Names and Numbers and renewed the customer's advertising with Arvig Media. The customer was very confused and said she thought she was renewing with Names and Numbers and said she would send Names and Numbers a copy of what she signed. She also said she is getting ad proofs from Arvig Media for her phone book advertising. Names and Numbers called back and the customer will now not talk to them, which is quite uncharacteristic. Upon information and belief, Ms. Beck contacted them.

b. Customer B: Ms. Beck turned in the contract to Names and Numbers on July 29, 2025 and said the customer was out of business. Names and Numbers called and the office manager confirmed they were very much still open but would not talk to Names and Numbers about their advertising. This was a $10,000 customer.

c. Customer C: Ms. Beck turned in a cancelled contract on July 14, 2025 to Names and Numbers. The customer told Names and Numbers just days ago that it was renewing its print advertising with Ms. Beck and Arvig Media last week. This was a $772 customer.

d. Customer D: Ms. Beck turned in a cancelled contract on July 29, 2025. The customer said Ms. Beck saw him recently and offered them the same ad program in the Names and Numbers phone book for half price in the Arvig Media book. This was a $3,000 customer.

e. Customer E: Ms. Beck turned in a cancelled contract to Names and

Numbers on July 2, 2025. The customer confirmed the cancellation but when asked further questions about Names and Numbers or Arvig Media, they hung up. This was a $767 customer.

46.     Arvig Media's unlawful conduct extends beyond Arizona. Names and Numbers has confirmed that in at least three other states (Washington, Idaho, and Oregon), Arvig Media representatives have made false and/or negligent representations to Names and Numbers' customers to secure their business.

47.     For example, an Arvig Media representative approached one of Names and Numbers' customer in Yakima, Washington, and told the Names and Numbers' customer that he was replacing the Names and Numbers' employee that typically helped the customer with their renewals. The customer—thinking they were renewing with Names and Numbers—signed a contract with Arvig Media.

48.     Another example of Arvig Media's unlawful conduct is in Grangeville, Idaho. A Names and Numbers employee received an email from a Names and Numbers customer that she worked with, telling her that she will be missed. After calling the customer, the Names and Numbers employee learned that an Arvig Media representative approached them and told them that the Names and Numbers employee they usually dealt with had retired, and proceeded to sell them advertising using Names and Numbers' phone book.

49.     Based on this, and additional evidence that Names and Numbers continues to discover, Names and Numbers has good reason to believe that Arvig Media's actions are not limited to Arizona, but rather are part of a national scheme to defraud Names and Numbers' customers and to interfere with the contracts Names and Numbers has with its customers.

50.     As demonstrated above, Ms. Beck's and Arvig Media's actions include not only contacting proprietary customer lists of Names and Numbers, but also using know-how and Confidential Information (as defined in the Employment Contract) to the unjust enrichment of Ms. Beck and Arvig Media at the expense of Names and Numbers.

51.     Names and Numbers also recently ran a report of its own customers that Ms. Beck renewed digital products for and most likely moved the print dollars to Arvig Media.

52.     Ms. Beck started with $112,000 in sales in Lake Havasu to renew and Names and Numbers only received $30,000 in digital. This begs the question: What happened to the rest of the print sales that should have been moved to digital with Names and Numbers?

53.     Additionally, upon information and belief, Ms. Beck has moved about 74% to 79% of Names and Numbers' money in the Payson and White Mountain markets to Arvig Media through these unlawful actions. The logical assumption based on all the other information outlined herein is that they went with Arvig Media.

54.     While Ms. Beck continues to see advertisers in Lake Havasu, many of these advertisers buy in other Names and Numbers markets. Names and Numbers has a reasonable and well-founded fear that Ms. Beck and Arvig Media will continue their current courses of conduct and try to convert those customers' business from Names and Numbers to Arvig Media also.

55.     If this continues, Names and Numbers could lose all six (6) of its markets in Arizona; its revenue, customers, and Names and Numbers' own business reputation is going to be damaged beyond repair.

56.     Additionally, from January 2025 until her resignation in July 2025, Ms. Beck participated in Friday training sales rep sessions, in which she had complete access to all sales support materials and the Company's intranet with its proprietary information, including, but not limited to, Names and Numbers' rate card and previous years' customer contracts.

57.     The situation with Ms. Beck's and Arvig Media's misrepresentations, unfair competition, omissions of material facts to Names and Numbers' customers, and other interference in Names and Numbers' business relationships continues to grow worse each day.

# CAUSES OF ACTION

## Count One: Breach of Contract

### (Names and Numbers against the Becks)

58.     Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

59.     The Employment Contract is a valid and enforceable contract between Names and Numbers and Ms. Beck.

60.     Names and Numbers has performed all of its obligations under the Employment Contract, such as by compensating Ms. Beck for her work when due.

61.     Ms. Beck breached the Employment Contract by taking all the actions and inactions referred to elsewhere herein including, but not limited to, working for Names and Numbers' direct competitor while being employed with Names and Numbers; using Names and Numbers' current and potential customers to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers; misrepresenting or omitting what the nature of the contracts are that Ms. Beck was presenting to Names and Numbers' customers; using knowledge or know-how regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to their own customers; and otherwise contacting Names and Numbers' current and potential customers and diverting their business to Arvig Media to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers.

62.     Names and Numbers has been damaged in an amount to be determined by the trier-of-fact.

63.     Since Arizona is a marital community property state, the Becks are liable for Ms. Beck's actions and/or inactions described elsewhere herein.

64.     This claim arises out of contract; accordingly, Names and Numbers is entitled to recover its reasonable attorneys' fees and costs under A.R.S. § 12-341, A.R.S. § 12-341.01, and the Employment Contract.

/ / /

## Count Two: Breach of the Covenant of Good Faith and Fair Dealing
### (Names and Numbers against the Becks)

65.    Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

66.    Names and Numbers and Ms. Beck are parties to, and are bound by, the Employment Contract.

67.    Under the Employment Contract, Names and Numbers and Ms. Beck owe each other an implied duty of good faith and fair dealing.

68.    Under the implied covenant of good faith and fair dealing, Ms. Beck is and was prohibited from any conduct that would prevent Names and Numbers from receiving the benefits it is entitled to under the Employment Contract.

69.    Ms. Beck breached the implied covenant of good faith and fair dealing by taking all the actions and inactions referred to elsewhere herein including, but not limited to, working for Names and Numbers' direct competitor while being employed with Names and Numbers; using Names and Numbers' current and potential customers to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers; misrepresenting or omitting what the nature of the contracts are that Ms. Beck was presenting to Names and Numbers' customers; using knowledge or know-how regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to their own customers; and otherwise contacting Names and Numbers' current and potential customers and diverting their business to Arvig Media to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers.

70.    Ms. Beck's breaches of the Employment Contract deprived Names and Numbers of the benefits of their bargain.

71.    Names and Numbers has been damaged in an amount to be determined by the trier-of-fact.

72.    Since Arizona is a marital community property state, the Becks are liable for Ms. Beck's actions and/or inactions described elsewhere herein.

73.     Ms. Beck's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive damages in an amount to be proven at trial, but sufficient to deter such actions in the future.

74.     This claim arises out of contract; accordingly, Names and Numbers is entitled to recover its reasonable attorneys' fees and costs under A.R.S. § 12-341, A.R.S. § 12-341.01, and the Employment Contract.

## Count Three: Breach of Fiduciary Duties
### (Names and Numbers against the Becks)

75.     Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

76.     As a former employee of Names and Numbers, Ms. Beck had fiduciary duties including the duties of loyalty, good faith, and care, to Names and Numbers until at least July 22, 2025.

77.     Ms. Beck breached these fiduciary duties by the actions referred to elsewhere herein including, but not limited to, working for Names and Numbers' direct competitor while being employed with Names and Numbers; using Names and Numbers' current and potential customers to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers; misrepresenting or omitting what the nature of the contracts are that Ms. Beck was presenting to Names and Numbers' customers; using knowledge or know-how regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to their own customers; and otherwise contacting Names and Numbers' current and potential customers and diverting their business to Arvig Media to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers.

78.     As a result, Names and Numbers has been damaged in an amount to be determined by the trier-of-fact.

79.     Ms. Beck's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive

1  damages in an amount to be proven at trial, but sufficient to deter such actions in the

2  future.

3      80.    Names and Numbers is entitled to judgment for all of its consequential

4  damages incurred for any of the actions of Ms. Beck which are found to be in breach of

5  the fiduciary duties which she owed to Names and Numbers.

6      81.    Since Arizona is a marital community property state, the Becks are liable

7  for Ms. Beck's actions and/or inactions described elsewhere herein.

8              **Count Four: Unfair Competition**

9      **(Names and Numbers against the Becks and Arvig Media)**

10     82.    Names and Numbers incorporates all other paragraphs of this complaint, by

11  this reference, as though fully set forth below.

12     83.    Arvig Media and Ms. Beck have unfairly competed with Names and

13  Numbers by, taking the actions and inactions referred to herein including, but not

14  limited to, having Ms. Beck work for Arvig Media at the same time as Names and

15  Numbers (which is inherently confusing to current and potential customers); using

16  Names and Numbers' current and potential customers to enrich Arvig Media and Ms.

17  Beck at the expense of Names and Numbers; misrepresenting or omitting what the

18  nature of the contracts are that Ms. Beck was presenting to Names and Numbers'

19  customers; using knowledge or know-how regarding Names and Numbers' proprietary

20  pricing to undercut Names and Numbers to their own customers; and otherwise

21  contacting Names and Numbers' current and potential customers and diverting their

22  business to Arvig Media to enrich Arvig Media and Ms. Beck at the expense of Names

23  and Numbers.

24     84.    These actions are in violation of Arizona law prohibiting parties from

25  causing confusion of the public so that they believe or are likely to believe that the

26  goods or services of the defendant are the goods or services of the plaintiff or that the

27  plaintiff is in some way connected with or is a sponsor for the defendant.

28     85.    As a result, Names and Numbers has been damaged in an amount to be

determined by the trier-of-fact.

86.    Names and Numbers is entitled to judgment for all of its consequential damages incurred for any of the actions of Ms. Beck and Arvig Media which are found to be in breach of the fiduciary duties which she owed to Names and Numbers.

87.    Ms. Beck's and Arvig Media's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive damages in an amount to be proven at trial, but sufficient to deter such actions in the future.

88.    Since Arizona is a marital community property state, the Becks are liable for Ms. Beck's actions and/or inactions described elsewhere herein.

### Count Five: Interference with Contract

**(Names and Numbers against the Becks and Arvig Media)**

89.    Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

90.    Names and Numbers had written contracts with many customers to provide them with digital and print advertising.

91.    Ms. Beck knew about these contracts.

92.    Arvig Media knew or should have known about these contracts through Ms. Beck under the principles of agency law (as Arvig Media was Ms. Beck's principal and Ms. Beck was Arvig Media's agent, whether through actual or apparent authority) or under the doctrine of *respondeat superior*.

93.    Ms. Beck and Arvig Media intentionally interfered with Names and Numbers' contractual relationship with its customers through the actions and inactions described elsewhere herein, which caused a breach of the contracts and a termination of those expectancies to be timely realized by depriving Names and Numbers of the business of its previously-loyal customers.

94.    Ms. Beck's and Arvig Media's conduct was improper.

95.    Names and Numbers has already sustained, and will continue to sustain,

1  significant damages due to Ms. Beck's and Arvig Media's actions in an amount to be
2  determined by the trier-of-fact.

3       96.    Ms. Beck's and Arvig Media's acts were gross, wanton, intentional, and/or
4  in reckless disregard to the rights of Names and Numbers, thus justifying an award of
5  punitive damages in an amount to be proven at trial, but sufficient to deter such actions
6  in the future.

### Count Six: Interference with Contract

### (Names and Numbers against Arvig Media)

9       97.    Names and Numbers incorporates all other paragraphs of this complaint, by
10 this reference, as though fully set forth below.

11      98.    Names and Numbers had a written employment contract with Ms. Beck for
12 her employment by Names and Numbers, namely, the Employment Contract.

13      99.    Arvig Media knew or should have known about the Employment Contract.

14      100.   Upon information and belief, Ms. Beck provided to Arvig Media a copy of
15 a written employment agreement similar to the one Ms. Beck had with Names and
16 Numbers, for Arvig Media's review.

17      101.   Arvig Media intentionally interfered with Names and Numbers' contractual
18 relationship with Ms. Beck through the actions and inactions described elsewhere
19 herein, which caused breaches of the Employment Contract by Ms. Beck, and,
20 consequently, damage to Names and Numbers' business relationships and potential
21 business relationships with Names and Numbers' customers and potential customers.

22      102.   Arvig Media's conduct was improper.

23      103.   Names and Numbers has already sustained, and will continue to sustain,
24 significant damages due to Arvig Media's actions in an amount to be determined by the
25 trier-of-fact.

26      104.   Arvig Media's acts were gross, wanton, intentional, and/or in reckless
27 disregard to the rights of Names and Numbers, thus justifying an award of punitive
28 damages in an amount to be proven at trial, but sufficient to deter such actions in the

future.

## **Count Seven: Interference with Business Expectancy**

### **(Names and Numbers against the Becks and Arvig Media)**

105.    Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

106.    Names and Numbers had business relationships and expectancies with many of its existing customers to provide them with digital and print advertising.

107.    Ms. Beck knew about these business relationships and expectancies.

108.    Arvig Media knew or should have known about these business relationships and expectancies through Ms. Beck under the principles of agency law (as Arvig Media was Ms. Beck's principal and Ms. Beck was Arvig Media's agent, whether through actual or apparent authority) or under the doctrine of *respondeat superior*.

109.    Ms. Beck and Arvig Media intentionally interfered with Names and Numbers' contractual relationship with its customers through the actions and inactions described elsewhere herein, which caused a termination of these business relationships and expectancies by depriving Names and Numbers of the future business of its previously-loyal customers.

110.    Ms. Beck's and Arvig Media's conduct was improper.

111.    Names and Numbers has already sustained, and will continue to sustain, significant damages due to Ms. Beck's and Arvig Media's actions in an amount to be determined by the trier-of-fact.

112.    Ms. Beck's and Arvig Media's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive damages in an amount to be proven at trial, but sufficient to deter such actions in the future.

## **Count Eight: Common Law Fraud**

### **(Names and Numbers against the Becks and Arvig Media)**

113.    Names and Numbers incorporates all other paragraphs of this complaint, by

1  this reference, as though fully set forth below.

2    114.  Ms. Beck made implicit if not explicit representations to Names and

3  Numbers that Ms. Beck was fulfilling her employment at Names and Numbers in good

4  faith.

5    115.  The representation was false because Ms. Beck was undermining Names

6  and Numbers' business at the same time as she was employed by Names and Numbers.

7    116.  Further, Ms. Beck was employed by Arvig Media during the same time that

8  she was employed by Names and Numbers, and Arvig Media is a direct competitor of

9  Names and Numbers.

10    117.  The representation was material, because it was sufficiently important to

11  influence Names and Numbers' actions in continuing to employ Ms. Beck and to

12  continue to give her access to Names and Numbers' customers, potential customer lists,

13  and proprietary information.

14    118.  Ms. Beck knew that the representation was false.

15    119.  Ms. Beck intended that Names and Numbers would act upon the

16  representation in the manner reasonably contemplated by Ms. Beck in continuing to

17  employ her and give her such access.

18    120.  Names and Numbers did not know that the representation was false.

19    121.  Names and Numbers relied on the truth of the representation.

20    122.  Names and Numbers' reliance was reasonable and justified under the

21  circumstances.

22    123.  As a result, Names and Numbers was damaged.

23    124.  Ms. Beck's actions described above are attributable to Arvig Media under

24  the principles of agency law (as Arvig Media was Ms. Beck's principal and Ms. Beck

25  was Arvig Media's agent, whether through actual or apparent authority) or under the

26  doctrine of *respondeat superior*.

27    125.  Names and Numbers has already sustained, and will continue to sustain,

28  significant damages due to Ms. Beck's and Arvig Media's actions in an amount to be

1  determined by the trier-of-fact.

2  126.   Arvig Media's and Ms. Beck's acts were gross, wanton, intentional, and/or

3  in reckless disregard to the rights of Names and Numbers, thus justifying an award of

4  punitive damages in an amount to be proven at trial, but sufficient to deter such actions

5  in the future.

6  ## Count Nine: Racketeering

7  **(Names and Numbers against the Becks and Arvig Media)**

8  127.   Names and Numbers incorporates all other paragraphs of this complaint, by

9  this reference, as though fully set forth below.

10  128.   Arvig Media and Ms. Beck engaged in a pattern of unlawful activity for the

11  purpose of financial gain.

12  129.   More specifically, Arvig Media and Ms. Beck have committed two or more

13  instances of a scheme or artifice to defraud, namely, interfering with contract,

14  interfering with business expectancy, and unfair competition, all as further described

15  above, to the detriment of Names and Numbers.

16  130.   Arvig Media's and Ms. Beck's pattern of unlawful activity caused Names

17  and Numbers' damages.

18  131.   Names and Numbers' damages were a reasonably foreseeable result of

19  Arvig Media's and Ms. Beck's pattern of unlawful activity.

20  132.   Names and Numbers has already sustained, and will continue to sustain,

21  significant damages due to Arvig Media's and Ms. Beck's actions in an amount to be

22  determined by the trier-of-fact.

23  133.   Arvig Media's and Ms. Beck's acts were gross, wanton, intentional, and/or

24  in reckless disregard to the rights of Names and Numbers, thus justifying an award of

25  punitive damages in an amount to be proven at trial, but sufficient to deter such actions

26  in the future.

27  / / /

28  / / /

## Count Ten: Civil Conspiracy

### (Names and Numbers against the Becks and Arvig Media)

134.    Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

135.    Arvig Media and Ms. Beck agreed—whether explicitly or implicitly—to accomplish the unlawful purposes of defrauding Names and Numbers, racketeering, interfering with contract, interfering with business expectancy, and unfair competition, all as further described above, to the detriment of Names and Numbers.

136.    Names and Numbers has already sustained, and will continue to sustain, significant damages due to Arvig Media's and Ms. Beck's actions in an amount to be determined by the trier-of-fact.

137.    Arvig Media's and Ms. Beck's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive damages in an amount to be proven at trial, but sufficient to deter such actions in the future.

## Count Eleven: Aiding and Abetting Tortious Conduct

### (Names and Numbers against Arvig Media)

138.    Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

139.    Arvig Media took the actions and inactions elsewhere described herein to aid and abet Ms. Beck in paving the way for, and assisting in, as elsewhere described herein, Ms. Beck's purposeful misleading of Names and Numbers' current and potential customers; Ms. Beck's interference with contracts and with business expectancies; Ms. Beck's breaches of fiduciary duties; and Ms. Beck's unfair competition with Names and Numbers.

140.    Names and Numbers has already sustained, and will continue to sustain, significant damages due to Arvig Media's actions in an amount to be determined by the trier-of-fact.

141.   Arvig Media's acts were gross, wanton, intentional, and/or in reckless disregard to the rights of Names and Numbers, thus justifying an award of punitive damages in an amount to be proven at trial, but sufficient to deter such actions in the future.

### Count Twelve: Unjust Enrichment / Disgorgement
### (Names and Numbers against the Becks and Arvig Media)

142.   Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

143.   Ms. Beck and Arvig Media have been directly enriched by Ms. Beck's and Arvig Media's wrongful conduct as alleged herein.

144.   To the extent that Ms. Beck and/or Arvig Media have taken and retained funds belonging to Names and Numbers, to which they are not legally or equitably entitled, Names and Numbers has been impoverished as a result of Ms. Beck's and Arvig Media's wrongful conduct, as alleged herein.

145.   There is a connection between the enrichment and the impoverishment, as alleged herein.

146.   There is an absence of justification for the enrichment and the impoverishment, as alleged herein.

147.   To the extent that there is no adequate legal remedy and/or because the circumstances alleged herein are unjust under principles of equity, an award should be made against the Becks and Arvig Media and in favor of Names and Numbers requiring the Becks and Arvig Media to disgorge the amounts obtained from the wrongful conduct, and (to the extent not duplicative) to pay Names and Numbers for the amount they were impoverished.

### Count Thirteen: Preliminary and Permanent Injunction
### (Names and Numbers against the Becks and Arvig Media)

148.   Names and Numbers incorporates all other paragraphs of this complaint, by this reference, as though fully set forth below.

149.    Ms. Beck and Arvig Media have and will, unless restrained and enjoined by the Court, continue contacting Names and Numbers' current print and/or digital advertising customers to divert business away from Names and Numbers and toward Arvig Media, whether dishonestly and/or unfairly.

150.    Ms. Beck and Arvig have caused, and will continue to cause, great, immediate, and irreparable harm to Names and Numbers' business, customer relationships, and reputation as a direct and proximate result of Ms. Beck's and Arvig Media's continued misleading and/or unfair sales activities as described elsewhere herein.

151.    Wherefore, Names and Numbers are entitled to a temporary restraining order, and then an order—followed by a judgment—for injunctive relief, as follows:

    a.    enjoining Defendants (including any agents, affiliates, or others working under, through, or with them) from using, disclosing, copying, or divulging Names and Numbers' confidential information in their possession or control for any purpose;

    b.    enjoining Defendants (including any agents, affiliates, or others working under, through, or with them) from (i) making any false representation to any Names and Numbers' current and/or potential customer; (ii) communicating negative and derogatory or otherwise defamatory statements about Names and Numbers to their current and/or potential customers; and (iii) falsely representing, negligently representing, and/or purposefully omitting material information to Names and Numbers' current and/or potential customers.

    c.    enjoining Defendants (including any agents, affiliates, or others working under, through, or with them) from soliciting, assisting in the solicitation of, accepting, or engaging in the advertisement business of any customer of Names and Numbers for a period of 24 months from the entry of the injunction;

d.     enjoining Ms. Beck (including any agents, affiliates, or others working under, through, or with them) from carrying on or engaging in any business that competes with Names and Numbers' advertisement business in any area covered by a local business directory, for a period of 24 months from the entry of the injunction; and

e.     enjoining Defendants (including any agents, affiliates, or others working under, through, or with them) from using or disclosing any of Names and Numbers' proprietary, confidential, and/or trade secret business information, including, but not limited to, customer lists, customer portfolios, pricings, commissions, technical matters, business and financial information, methodologies, business and development plans, marketing strategies, product and service information, and sales goals and methods.

152.   Also, Names and Numbers are entitled to a temporary restraining order, and then an order—followed by a judgment—for injunctive relief, restraining and enjoining Ms. Beck and Arvig Media from violating Paragraph 9 of the Employment Contract ("Covenant Not to Compete").

## DEMAND FOR JURY TRIAL

153.   Names and Numbers respectfully demands a trial by jury on all issues for which it is entitled to one under applicable law.

## REQUEST FOR RELIEF

Wherefore, Names and Numbers requests a judgment in its favor, and against the Becks and Arvig Media, as follows:

A.     Awarding Names and Numbers all its compensatory, incidental, and consequential damages in an amount to be determined by the trier-of-fact;

B.     Awarding Names and Numbers punitive damages in an amount to be determined by the trier-of-fact;

C.      Awarding Names and Numbers equitable relief as requested herein;

D.      Awarding Names and Numbers preliminary and permanent injunctive relief as requested herein;

E.      Awarding Names and Numbers treble damages under A.R.S. § 13-2314.04(A);

F.      Awarding Names and Numbers its reasonable attorneys' fees and costs related to this matter under, without limitation, A.R.S. § 12-341, A.R.S. § 12-341.01, A.R.S. § 13-2314.04(A), and the Employment Contract, which in the event of a default shall be $10,000;

G.      Awarding Names and Numbers its pre- and post-judgment interest on all amounts awarded at the highest rates allowed by law; and

H.      Awarding such other or further relief as this Court deems just or equitable.


RESPECTFULLY SUBMITTED this 20th day of August, 2025.


**STINSON LLP**

By:  s/ Jeffrey D. Harris
     Jeffrey D. Harris
     Annabel Barraza
     1850 N. Central Avenue, Suite 2100
     Phoenix, AZ 85004
     *Attorneys for Plaintiff K.W. Brock*
     *Directories, Inc. aka Names and Numbers*

## <u>VERIFICATION</u>

1.     I, Todd McKnight, am the President of KW Brock Directories, Inc. aka Names and Numbers, Plaintiff in the foregoing action.

2.     I have read the foregoing complaint and know the contents thereof.

3.     The contents of the "General Allegations" section of the complaint, found at paragraphs 7 through 57, are true to my own personal knowledge, except as to those statements made upon information and belief; as to those, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

08/20/2025

Executed on August __, 2025.



DocuSigned by:

D831C0BA3DBC4A8...

TODD McKNIGHT