Jeffrey D. Harris (SBN AZ 031136)
Annabel Barraza (SBN AZ 037108)
**STINSON LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004
Telephone: 602.279.1600
jeff.harris@stinson.com
annabel.barraza@stinson.com

*Attorneys for Plaintiff K.W. Brock Directories, Inc.
aka Names and Numbers*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| K.W. Brock Directories, Inc. aka Names and Numbers, a Kansas corporation,<br><br>Plaintiff,<br><br>v.<br><br>Arvig Media Enterprises, Inc. dba Arvig Media, a Minnesota corporation; Cydni Beck aka Cyd Beck and Doe Beck, a married couple,<br><br>Defendants. | Case No. 3:25-cv-08172-MTL<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>**[Oral Argument and Expedited Ruling Requested]** |

Under Fed. R. Civ. P. 65, K.W. Brock Directories, Inc. aka Names and Numbers ("Names and Numbers" or the "Company") moves for a preliminary injunction against Arvig Media Enterprises, Inc. dba Arvig Media ("Arvig Media"), and Cydni Beck[1] ("Ms. Beck") and (collectively, "Defendants"), for the reasons stated below, including that Defendants are engaged in an ongoing national scheme to unlawfully co-opt Names and Numbers' confidential and proprietary information and to damage Names and Numbers' business by making numerous false representations to its current customers.

---

[1] Doe Beck is named only to bind the Becks' marital community.

Thus, Names and Numbers requests this Court to issue an order:

1. enjoining Defendants (including any of their officers, agents, servants, employees, or attorneys) from using, disclosing, copying, or divulging Names and Numbers' Confidential Information[2] in their possession or control for any purpose;

2. enjoining Defendants (including any of their officers, agents, servants, employees, or attorneys) from: (i) making any false representation to any of Names and Numbers' current and/or potential customers; (ii) communicating negative, derogatory, or otherwise defamatory statements about Names and Numbers to Names and Numbers' current and/or potential customers; and (iii) falsely representing, negligently representing, and/or purposefully omitting material information to Names and Numbers' current and/or potential customers;

3. enjoining Defendants (including any of their officers, agents, servants, employees, or attorneys) from soliciting, assisting in the solicitation of,

---

[2] "Confidential Information" has the same definition as in the Employment Contract, namely:

> trade secrets, confidential and/or proprietary information of the Company, including but not limited to all information used by or belonging to or relating to the Company or any subsidiary, parent or affiliate of the Company which is not generally known to the public or to the industry in which the Company is or may become engaged, including, without limitation, past, present or future business or trade secrets, customers or customer lists, prospects or prospect lists, price lists, cost lists, methods, policies, formulas, procedures, know-how, manuals, handbooks, instructions, techniques, business strategies, marketing or development plans, devices, records, drawings, demonstrations, samples, models, blueprints, reports, specifications, designs, technology and digital products, computer hardware and software, key employees, financial or proprietary information and all other information, knowledge or data of any kind or character relating to the products or business of the Company or any subsidiary, parent or affiliate of the Company whether or not reduced to writing, which should be treated as confidential information, and all copies and duplications thereof . . . .

Employment Contract, attached as Exhibit A to the Complaint, at Section 7 [Doc 1-1 at page 3 of 16].

2

<div style="padding-left:2em">

accepting, or advertising to any customer of Names and Numbers for a period of 24 months from the entry of the injunction; and

4. enjoining Ms. Beck (including any of her agents, servants, employees, or attorneys) from carrying on or engaging in any business that competes with Names and Numbers' advertisement business in any area covered by a Names and Numbers local business directory, for a period of 24 months from the entry of the injunction.

</div>

Names and Numbers meets the requirements under Rule 65 for a preliminary injunction. Names and Numbers has established a strong likelihood of success on the merits. Specifically, Names and Numbers has clearly shown that Defendants have unlawfully used Names and Numbers' Confidential Information in violation of express contractual provisions and Arizona and Kansas law.[3][4] Names and Numbers has also shown that, absent injunctive relief, it will continue to suffer irreparable harm to its business, reputation, and goodwill. Moreover, both the balance of equities and the public interest favor granting Names and Numbers' requested relief, which merely requires that Defendants abide by the law and that Ms. Beck honor her contractual obligations. This motion is supported by Names and Numbers' Verified Complaint and its exhibits—which are themselves supported by the verification and thus the sworn testimony of Names and Numbers' president, Todd McKnight—and the following Memorandum of Points and Authorities.

<div style="text-align:center">**MEMORANDUM OF POINTS AND AUTHORITIES**</div>

**I.      FACTUAL BACKGROUND.**

    **A.      Names and Numbers' Business**

Names and Numbers publishes local business directories in the U.S. and Canada. It offers customers, among other things, online and printed advertising. It has been

---

[3] The Employment Contract is subject to Kansas law. Defendants' other actions and inactions are subject to Arizona law as they have done business here.

[4] Names and Numbers only seeks preliminary relief on the claims specified in this motion, though it asserts additional claims in the Verified Complaint.

providing these services and building its advertising business since 1974. Names and Numbers is in a "highly competitive business," and for that reason it "expends a considerable amount of time, effort, and money" in developing business from new clients and preserving business from its existing clients. [*See* Doc. 1, Verified Complaint, at ¶ 14; *see also* Doc. 1-1, Ex. A to the Complaint, at Recitals found on page 2 of 16.] Its success heavily depends on its ability to "maintain its competitive edge" by protecting "its existing proprietary information and technology" but also developing new proprietary information, technology, and business methods. [*See id.*] Names and Numbers is a business out of Pittsburg, Kansas, with 100+ employees that offers directories in 85 markets and 17 states. [*See, for example*, Doc. 1, Verified Complaint, at ¶ 22.] The nature of the business makes on-the-ground employees even more important to the success of the business—they develop and maintain the client relationships.

Arvig Media is a business competitor of Names and Numbers—it also offers print and online advertising for local businesses.

**B.     The Employment Contract**

Names and Numbers employed Ms. Beck as a salesperson from October 21, 2022 to July 22, 2025. The terms of Ms. Beck's employment were memorialized in a Salesperson Employment Contract ("Employment Contract"). [*See* Doc. 1, Verified Complaint, at ¶ 13; *see generally also* Doc. 1-1, Ex. A to the Complaint.]

The Employment Contract included several key provisions important to Names and Numbers' business. Among those relevant to this motion are:

- Paragraph 1 ("Duties of Employee"), which set forth Ms. Beck's affirmative duties, including, among others, "[t]o solicit, secure, and maintain for Company local business directories and digital products advertising contracts" and "[t]o devote best efforts exclusively in furtherance of Company's business on a full time basis, and not to represent any other company without the specific prior written permission of Company." [*See* Doc. 1, Verified

Complaint, at ¶ 15; *see also* Doc. 1-1, Ex. A to the Verified Complaint, at Paragraph 1 found on page 2 of 16.]

- Paragraph 7 ("Non-Disclosure of Information"), which states that Ms. Beck may have access to Names and Numbers' "trade secrets, confidential and/or proprietary information" and "agrees to treat all Confidential Information as confidential and will not during the term of employment or at any time subsequent to the termination of employment communicate or disclose" this Confidential Information, "nor duplicate or use for any reason or purpose . . . other than for the benefit of [Names and Numbers]." [*See* Doc. 1, Verified Complaint, at ¶ 16; *see also* Doc. 1-1, Ex. A to the Verified Complaint, at Paragraph 7 found on page 3 of 16.]

- Paragraph 8 ("Non-Solicitation and Non-Disclosure"), which restricts Ms. Beck from "[s]olicit[ing], accept[ing], or servic[ing] or attempt[ing] to solicit, accept, or service, any business similar" to Names and Numbers' business from any person, corporation or other entity who is a customer of Names and Numbers, or was a customer during the term of Ms. Beck's employment for 24 months after her termination. [*See* Doc. 1, Verified Complaint, at ¶ 17; *see also* Doc. 1-1, Ex. A to the Complaint, at Paragraph 8 found on pages 3-4 of 16.]

- Paragraph 9 ("Covenant Not to Compete"), which states that for a period of two years after her termination, Ms. Beck will not "engage in, or cause to be operated or engaged in directly, indirectly or through others any Competitive Business, or [d]isseminate or cause to be disseminated advertising material related to any Competitive Business" "within any area covered by [Names and Numbers'] local business directory (print and online) . . . , and a radius of twenty-five (25) miles beyond such areas." "'Competitive Business' means any business activity which involves or relates to publication of print or online local business directories and digital products, or solicitation of

5

advertising . . . ." [*See* Doc. 1, Verified Complaint, at ¶ 18; *see also* Doc. 1-1, Ex. A to the Complaint, at Paragraph 9 found on page 4 of 16.]

- Paragraph 10 ("Disclosure of Agreement"), which states, in full: "Employee agrees to provide a copy of this Agreement any prospective future employer prior to accepting employment with any such employer." [*See* Doc. 1, Verified Complaint, at ¶ 19; *see also* Doc. 1-1, Ex. A to the Complaint, at Paragraph 10 found on page 4 of 16.]

C.     **Ms. Beck's Employment with Names and Numbers**

In or around July 2025, Names and Numbers learned that Ms. Beck was simultaneously employed by Arvig Media and Names and Numbers, which was a violation of her Employment Contract. Names and Numbers also learned that during her employment with Names and Numbers, Ms. Beck was:

- using Names and Numbers' list of current customers to create business opportunities for its direct competitor, Arvig Media, and to enrich herself at Names and Numbers' detriment—diverting Names and Numbers' customers to Arvig Media and receiving compensation for it [*See* Doc. 1, Verified Complaint, at ¶ 24(a)];
- upon information and belief, using Names and Numbers' list of potential customers to do the same [*See* Doc. 1, Verified Complaint, at ¶ 24(b)];
- contacting current and/or potential Names and Numbers' customers in her capacity as both an employee of Names and Numbers and of Arvig Media [*See* Doc. 1, Verified Complaint, at ¶ 24(c)];
- upon information and belief, communicating negative and derogatory or otherwise defamatory statements about Names and Numbers to their current and/or potential customers to divert the customers' business away from Names and Numbers and toward Arvig Media, thereby enriching Arvig Media and herself with no justification [*See* Doc. 1, Verified Complaint, at ¶ 24(d)]; and

6

- falsely representing, negligently representing, and/or purposefully omitting material information to Names and Numbers' current and/or potential customers during her communications with them—falsely telling them that they were signing a contract with Names and Numbers when they were, in fact, signing with Arvig Media, such as by, without limitation, not giving the current or potential customer the full truth of Ms. Beck's intentions for conducting business with them and/or by physically obscuring the name of the business on the proposed contract [*See* Doc. 1, Verified Complaint, at ¶ 24(e)].

About 10 weeks ago, when Names and Numbers began revisiting customer renewals in the Lake Havasu market, Ms. Beck emailed a copy of a Names and Numbers' form employment contract to Arvig Media. [*See* Doc. 1, Verified Complaint, at ¶ 35]. Upon information and belief, Arvig Media reviewed the employment contract and knew about the covenants applicable to Ms. Beck during her employment with Names and Numbers and after her resignation.

Names and Numbers recently looked into the emails sent by Ms. Beck from her Names and Number email address while she was employed at Names and Numbers. Names and Numbers found, among other things:

- an email from Ms. Beck to a current Names and Numbers customer stating that "Your print is with Arvig ad your digital is with Names and Numbers," intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C. Beck to M. Kopfmann dated April 8, 2025, attached hereto as **Exhibit A**];
- an email from Ms. Beck to a current Names and Numbers customer stating that "Names and numbers decided to go full digital and not put out a phone book. . . . Leaving room for another company to move in and provide a book[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media and then pitching Arvig Media to

7

them [*see* Email from C. Beck to C. Bolan dated July 22, 2025, attached hereto as **Exhibit B**];

- an email from Ms. Beck to a current Names and Numbers customer stating that "Your print is with Arvig and your digital is with Names And Numbers[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C. Beck to M. Kopfmann dated April 7, 2025, attached hereto as **Exhibit C**];
- an email from Ms. Beck to a current Names and Numbers customer stating that "Arvig bought Names & Numbers[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C. Beck to R. Flair dated April 9, 2025, attached hereto as **Exhibit D**];
- an email from Ms. Beck to a current Names and Numbers customer stating that "We have gone through another rebranding. We are now Arvig Media[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C. Beck to R. Flair dated March 19, 2025, attached hereto as **Exhibit E**];
- an email from Ms. Beck to a current Names and Numbers customer stating that "[Names and Numbers] have decided to go full on digital so Arvig Media will be putting out the book which explains the other contract attached just re-branding[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C. Beck to K. Young dated March 10, 2025, attached hereto as **Exhibit F**]; and
- an email from Ms. Beck to a current Names and Numbers customer stating that "The contractor [sic] reads Arvig as they have bought out Names And Numbers division[,]" intentionally misleading the Names and Numbers customer so that they would contract with Arvig Media [*see* Email from C.

8

Beck to one "Sue" at Mack Signs dated June 25, 2025, attached hereto as **Exhibit G**].

Further, many of these emails attach advertising contracts executed by the current/former Names and Numbers customer with Arvig Media. [*See generally* Exs. A through G.]

In the nearly three years that Ms. Beck was employed by Names and Numbers, she developed a business relationship with Names and Numbers' clients and customers in the regions assigned to her. Indeed, one of her principal responsibilities was developing and maintaining strong client relationships. In her position as a salesperson, she became intimately familiar with the services Names and Numbers offered, their pricing, their commission structure, sales and business plans, and their client contacts, among other Confidential Information. This was all strategic information key to Names and Numbers' success in Arizona.

### D.    Ms. Beck's Post-Employment Activities

Since leaving Names and Numbers, the Company has learned that Ms. Beck was actively selling in the Lake Havasu area. She is using the business relationship she developed during her employment with Names and Numbers—and the current and potential customer list—to divert existing customers from Names and Numbers toward Arvig Media.

Names and Numbers suspects that Ms. Beck has diverted no less than $82,000 in sales from Names and Numbers to Arvig Media. [*See, for example,* Doc. 1, Verified Complaint, at ¶ 52]. Names and Numbers further suspects that Ms. Beck has solicited and accepted business from numerous Names and Numbers' customers. Names and Numbers expects to discover the full extent of Ms. Beck's post-employment damage during discovery.

### E.    Arvig Media's Unfair Competition with Names and Numbers throughout the United States

Arvig Media's unlawful conduct extends beyond Arizona. Names and Numbers

9

has confirmed that in at least three other states (Washington, Idaho, and Oregon), Arvig Media representatives have made false and/or negligent representations to Names and Numbers' customers to secure their business. [Doc. 1, Verified Complaint, at ¶ 46.]

For example, an Arvig Media representative approached one of Names and Numbers' customer in Yakima, Washington, and told the Names and Numbers' customer that he was replacing the Names and Numbers' employee that typically helped the customer with their renewals. [*Id.* at ¶ 47.] The customer—thinking they were renewing with Names and Numbers—signed a contract with Arvig Media. [*Id.*]

Another example of Arvig Media's unlawful conduct is in Grangeville, Idaho. [*Id.* at ¶ 48.] A Names and Numbers employee received an email from a Names and Numbers customer that she worked with, telling her that she will be missed. [*Id.*] After calling the customer, the Names and Numbers employee learned that an Arvig Media representative approached them and told them the Names and Numbers employee they usually dealt with had retired, and proceeded to sell them advertising using Names and Numbers' phone book. [*Id.*]

Based on this, and additional evidence that Names and Numbers continues to discover, Names and Numbers has good reason to believe that Arvig Media's actions are not limited to Arizona, but rather are part of a national scheme to defraud Names and Numbers' customers and to interfere with the contracts Names and Numbers has with its customers. [*Id.* at ¶ 49.]

As demonstrated above, Ms. Beck's and Arvig Media's actions include not only contacting proprietary customer lists of Names and Numbers, but also using know-how and Confidential Information to the unjust enrichment of Ms. Beck and Arvig Media at the expense of Names and Numbers. [*Id.* at ¶ 50.]

Names and Numbers also recently ran a report of its own customers that Ms. Beck renewed digital products for and most likely moved the print dollars to Arvig Media. [*Id.* at ¶ 51.]

Ms. Beck started with $112,000 in sales in Lake Havasu to renew and Names and

Numbers only received $30,000 in digital. [*Id.* at ¶ 52.] This begs the question: What happened to the rest of the print sales that should have been moved to digital with Names and Numbers? [*Id.*]

Additionally, upon information and belief, Ms. Beck has moved about 74% to 79% of Names and Numbers' money in the Payson and White Mountain markets to Arvig Media through these unlawful actions. [*Id.* at ¶ 53.] The logical assumption based on all the other information outlined herein is that they went with Arvig Media. [*Id.*]

While Ms. Beck continues to see advertisers in Lake Havasu, many of these advertisers buy in other Names and Numbers markets. [*Id.* at ¶ 54.] Names and Numbers has a reasonable and well-founded fear that Ms. Beck and Arvig Media will continue their current courses of conduct and try to convert those customers' business from Names and Numbers to Arvig Media also. [*Id.*]

If this continues, Names and Numbers could lose all six (6) of its markets in Arizona; its revenue, customers, and Names and Numbers' own business reputation is going to be damaged beyond repair. [*Id.* at ¶ 55.]

Additionally, from January 2025 until her resignation in July 2025, Ms. Beck participated in Friday training sales rep sessions, in which she had complete access to all sales support materials and the Company's intranet with its proprietary information, including, but not limited to, Names and Numbers' rate card and previous years' customer contracts. [*Id.* at ¶ 56.]

The situation with Ms. Beck's and Arvig Media's misrepresentations, unfair competition, omissions of material facts to Names and Numbers' customers, and other interference in Names and Numbers' business relationships continues to grow worse each day. [*Id.* at ¶ 57.]

## II. <u>NAMES AND NUMBERS SATISFIES THE STANDARD FOR A PRELIMINARY INJUNCTION</u>

A court may grant a preliminary injunction when the movant establishes: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm if the injunction

does not issue; (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). These "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). All four factors here strongly favor granting a preliminary injunction.

### A. **Names and Numbers is likely to prevail on the merits on which it seeks preliminary injunction.**

Ms. Beck has violated the non-compete, non-solicitation, and non-disclosure provisions in her Employment Contract. Ms. Beck works for Arvig Media and has been using Names and Numbers' Confidential Information and the relationships she built with Names and Numbers' customers to solicit and divert business from Names and Numbers' current and potential customers in violation of her Employment Contract and Arizona and Kansas law. Ms. Beck is using Names and Numbers' confidential and trade secret information to her and Arvig Media's unfair advantage at Names and Numbers' expense. The resulting damage is already manifest—Names and Numbers has lost significant sales revenue and many customers.

Ms. Beck's actions constitute, at minimum, breach of contract, unfair competition, tortious interference with contract, and tortious interference with business expectancy. All of these claims are actionable under statutory or common law, and any one of them supports the entry of a preliminary injunction to prevent Ms. Beck from jeopardizing and further harming Names and Numbers' business.

Similarly, Arvig Media's actions are unlawful, and Names and Numbers is likely to succeed on the merits of the claims it has brought against Arvig Media. Arvig Media knew or should have known about the contracts Names and Numbers had with (1) Ms. Beck for her employment, and (2) its customers to provide both digital and print advertising. Arvig Media should have also known that Names and Numbers had business relationships and expectancies with its existing customers. Arvig Media's

actions therefore, at a minimum, amount to interference with contract and business expectancies.

1. The Becks have unlawfully breached the Employment Contract.

The Employment Contract at issue is governed by Kansas law.[5] Under Kansas law, Names and Numbers must prove "(1) execution and existence of the contract alleged in the petition; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) the defendant's breach insofar as such matters are in issue. *DeHaemers v. DeHaemers*, 371 P.3d 374 (Kan. Ct. App. 2016) (internal citations omitted). Names and Numbers satisfies each of these elements.

First, Names and Numbers entered into an Employment Contract with Ms. Beck and both executed it. [*See* Doc. 1, Verified Complaint, at ¶ 13; *see generally also* Doc. 1-1, Ex. A to the Complaint.] Ms. Beck was offered regular employment and a salary for her work under the Employment Contract. [*See* Doc. 1-1, Ex. A to the Complaint, at paragraphs 2 and 4 on pages 2 and 3 of 16.] Names and Numbers complied with its obligations under the Employment Contract, including paying Ms. Beck when due. [*See* Doc. 1, Verified Complaint, at ¶ 60.] Ms. Beck—at a minimum—breached the Employment Contract's non-competition clause. [*See* Doc. 1, Verified Complaint, at ¶ 18; *see also* Doc. 1-1, Ex. A to the Complaint, at Paragraph 9 found on page 4 of 16.] The non-competition restriction is reasonable in temporal and geographic scope. Ms. Beck also breached numerous other clauses of the Employment Contract as described in the Complaint. [*See, for example,* Doc. 1, Verified Complaint, at ¶¶ 14-18 and 24.] She breached paragraph 7 of the Employment Contract when she disclosed Names and Numbers' Confidential Information to Arvig Media, or at a minimum when she used Names and Numbers' Confidential Information for her benefit or the benefit of any person or entity other than Names and Numbers. [*See, for example,* Doc. 1, Verified

---

[5] *See* Employment Contract, attached as Exhibit A to the Complaint, at Section 16 [Doc 1-1 at page 5 of 16].

Complaint, at ¶¶ 24, 32-37, 45.] She also breached Paragraph 8 of the Employment Contract when she solicited, accepted, and serviced companies and/or businesses that Names and Numbers serviced during her employment. [*See id.*] Ms. Beck did this both while she was employed by Names and Numbers and after her resignation. [*See, for example,* Doc. 1, Verified Complaint, at ¶¶ 23, 56.]

Last, Ms. Beck's actions have resulted in irreparable damage to Names and Numbers and continue to cause damage. [*See* Doc. 1, Verified Complaint, at ¶¶ 42a-e, ¶ 45.] Names and Numbers is therefore likely to succeed on its breach of contract claim.

2. <u>Defendants have unfairly competed with Names and Numbers.</u>

A claim for unfair competition encompasses several tort theories, such as ". . . false advertising, 'palming off' and misappropriation. *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998). "Palming off" or "passing off" is a "false representation tending to induce buyers to believe that defendant's product is that of the plaintiff." *Id.* "The general purpose of the doctrine is to prevent business conduct that is 'contrary to honest practice in industrial or commercial matters.'" *Id.*

Here, it is evident that Ms. Beck has engaged in egregious "palming off," or at minimum, false advertising. She falsely represented, negligently represented, and/or purposefully omitted material information to Names and Numbers' current and/or potential customers during her communications with them that they would be contracting with Names and Numbers when they were, in fact, signing a contract with Arvig Media. She did this by, in part, failing to disclose the full truth of her intentions for conducting business with them and/or by physically obscuring the name of the business on the proposed contract. She further used her Names and Numbers email to communicate these lies to Names and Numbers customers, giving credibility to her lies.

Moreover, Arvig Media and Ms. Beck have unfairly competed with Names and Numbers by, at a minimum, having Ms. Beck work for a competitor—Arvig Media—at the same time as Names and Numbers (which is inherently confusing to current and potential customers); using Names and Numbers' current and potential customers to

enrich Arvig Media and Ms. Beck at the expense of Names and Numbers; misrepresenting or omitting the nature of the contracts that Ms. Beck was presenting to Names and Numbers' customers; using knowledge or know-how regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to their own customers; and otherwise contacting Names and Numbers' current and potential customers and diverting their business to Arvig Media to enrich Arvig Media and Ms. Beck at the expense of Names and Numbers.

Defendants violated Arizona law which prohibits parties from confusing the public so that they believe or are likely to believe that the goods and services of Arvig Media are the goods and services of Names and Numbers or that Names and Numbers is in some way sponsoring Arvig Media. Thus, Names and Numbers is likely to succeed on its unfair competition claim against Ms. Beck.

### 3. Defendants are tortiously interfering with contracts.

To bring a claim of intentional interference with contractual relations, the plaintiff must establish: (1) existence of a valid contractual relationship; (2) knowledge of the contractual relationship on the part of the interferer; (3) intentional interference inducing or causing a breach; (4) resultant damage to the party whose contractual relationship has been disrupted; and (5) improper action on the part of the interfering party. *ABCDW LLC v. Banning*, 241 Ariz. 427,436, 388 P.3d 821, 830 (Ct. App. Div. 1 2016).

Names and Numbers contracted with many customers to provide digital and print advertising. Ms. Beck knew about these contracts--in fact, she was often the Names and Numbers employee that facilitated contract renewals or acquisitions for them. Arvig Media knew or should have known about these contracts through Ms. Beck under the principles of agency law (as Arvig Media was Ms. Beck's principal and Ms. Beck was Arvig Media's agent, whether through actual or apparent authority) or under the doctrine of *respondeat superior*.

Moreover, Defendants intentionally interfered with Names and Numbers' contractual relationship with its customers through the actions and inactions described

elsewhere herein and in the Complaint, which caused a breach of the contracts and a termination of those expectancies to be realized by depriving Names and Numbers of the business of its previously loyal customers. Due to Defendants' unlawful conduct, Names and Numbers has sustained significant damages and will continue to do so, in the absence of a preliminary relief.

Names and Numbers is therefore likely to succeed on the merits of its tortious interference with contract claim.

    4. <u>Defendants are interfering with business expectancy.</u>

A claim for tortious interference must allege (1) "the existence of a valid contractual relationship or business expectancy;" (2) "the interferer's knowledge of the relationship or expectancy;" (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy;" and (4) "resultant damage to the party whose relationship or expectancy has been disrupted." *Dube v. Likins*, 216 Ariz. 406, 411, 167 P.3d 93, 98 (Ct. App. 2007) (internal quotation marks omitted) (citations omitted).

Names and numbers can prove these four elements. First, Names and Numbers entered into an Employment Contract with Ms. Beck. Second, Ms. Beck knew about the Contract and her obligations set forth in it. Arvig Media also knew or should have known about these contracts through Ms. Beck under the principles of agency law, stated above.

Third, Ms. Beck and Arvig Media intentionally interfered with Names and Numbers' contractual relationship with its customers through the actions and inactions described elsewhere herein and in the Complaint, which caused a breach of the contracts and a termination of those expectancies to be timely realized by depriving Names and Numbers of the business of its previously loyal customers. And last, Names and Numbers has already sustained significant damage and will continue to do so, absent preliminary relief.

As such, Names and Numbers is likely to succeed on its tortious interference with business expectancy claim.

### B. Names and Numbers will suffer irreparable harm if Defendants are not enjoined.

Names and Numbers' right to relief is expressly set forth in the Employment Contract at Paragraph 11. By signing the Employment Contract, Ms. Beck acknowledged that she understood that any breach of the covenants would cause irreparable harm to Names and Numbers, for which damages would not be an adequate remedy. [*See* Doc. 1, Verified Complaint, at ¶ 20; *see also* Doc. 1-1, Ex. A to the Complaint, at Paragraph 11 found on page 4 of 16.] Moreover, "[u]nder Arizona law, 'once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected.'" *Compass Bank v. Hartley*, 430 F.Supp.2d 973, 983 (D.Ariz.2006) (quoting *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs*, 164 Ariz. 54, 59, 790 P.2d 752, 757 (App. 1989) *disapproved on other grounds, Valley Med. Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277 (1999)). Additionally, as the non-solicitation and non-competition provisions have only a limited duration, injunctive relief is the only means possible to effectively enforce the restrictive covenants at issue. With respect to the Defendants' use and disclosure of Names and Numbers' Confidential Information, there will simply be no way to undo the potential damage if they are given unfettered license to take advantage of that information.

### C. Public policy supports the enforcement of the restrictive covenants.

Enforcing these properly-tailored non-solicitation, non-competition, and non-disclosure covenants is consistent with the public policy of protecting Names and Numbers' protectable interest in shielding its hard-earned customer base from unfair competition and pirating by an employee who exploited her relationships with Names and Numbers' customers. Indeed, Arizona courts have upheld more restrictive covenants than those that Names and Numbers seeks to enforce here, under less compelling circumstances. *See, e.g., Bed Mart, Inc. v. Kelley*, 202 Ariz. 370, 45 P.3d

1219 (App. 2002) (reversing the trial court's finding that a non-compete clause in an employment agreement was unenforceable when an employee of Bed Mart terminated their employment and began working instead at Sleep America).

Further, public policy mandates the protection of trade secrets and confidential information through preliminary injunctions. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). These policies are derived from several specific considerations, including fostering business ethics and fostering effective research and development, encouraging businesses to initiate new plans of operation, and ensuring that industrial espionage is not condoned or made profitable. *Id.*

Here, the public policy considerations clearly favor Names and Numbers. Names and Numbers seeks limited and reasonable protection of its advertising business and customer base. When Ms. Beck signed the Employment Contract, she agreed that these limitations were proper if she left Names and Numbers. This agreement was supported by more than adequate consideration, including continued employment. Completely disregarding this agreement, Ms. Beck secretly started her own scheme in collaboration with Arvig Media—Names and Numbers' business competitor—and made grave misrepresentations to Names and Numbers' customers to secure their business for Arvig Media instead of Names and Numbers. [*See, for example,* Doc. 1, Verified Complaint, at ¶ 24.] She continues to compete with Names and Numbers by using her relationship with Names and Numbers' customers and knowledge or know-how regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to their own customers; otherwise contacting Names and Numbers current and potential customers and diverting business to Arvig Media at the expense of Names and Numbers.

In short, fairness and public policy clearly weigh in favor of Names and Numbers proposed preliminary injunction.

**D.      The balance of equities tips sharply in favor of Names and Numbers.**

To successfully and profitably operate its business, Names and Numbers relies on the relationships between its employees and customers, the resulting revenues that it

derives from serving those customers, and the maintenance of its valuable Confidential Information. Enforcement of the restrictive covenants in this case is critical to the vindication of each of those protectable interests. The restrictions are appropriately tailored and seek to protect Names and Numbers' competitively sensitive information and investment in its customer base. *Cf., Bed Mart,* 45 P.3d 1219.

In contrast, enforcement of the Employment Contract would impose little hardship upon Defendants, who are prohibited from soliciting away Names and Numbers' customers and from using or disclosing Names and Numbers' proprietary information and trade secrets. Defendants may still carry on and engage in the advertising business, so long as they do so beyond any area covered by a local Names and Numbers business directory, and they may solicit and provide these services outside of boundary to anyone—both Names and Numbers' customers and non-customers.

### III. CONCLUSION

For the foregoing reasons, Names and Numbers respectfully requests that the Court grant Plaintiff's Motion for a Preliminary Injunction and that it enter an order enjoining Defendants from their ongoing unlawful actions. A form of order is filed herewith.

Respectfully submitted on August 25, 2025.

**STINSON LLP**

By: s/ *Jeffrey D. Harris*
Jeffrey D. Harris
Annabel Barraza
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004

*Attorneys for Plaintiff K.W. Brock Directories, Inc. aka Names and Numbers*