Jeffrey D. Harris (SBN AZ 031136)
Annabel Barraza (SBN AZ 037108)
STINSON LLP
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004
Telephone: 602.279.1600
jeff.harris@stinson.com
annabel.barraza@stinson.com

*Attorneys for Plaintiff K.W. Brock Directories, Inc.*
 *aka Names and Numbers*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| K.W. Brock Directories, Inc. aka Names and Numbers, a Kansas corporation, | Case No. 3:25-cv-08172-MTL |
| Plaintiff, | **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Cydni Beck aka Cyd Beck and Doe Beck, a married couple; Arvig Enterprises, Inc. dba Arvig Media, a Minnesota corporation, | |
| Defendants. | |

Plaintiff K.W. Brock Directories, Inc. aka Names and Numbers (hereinafter "Names and Numbers") hereby submits its proposed findings of fact and conclusions of law:

## I.    FINDINGS OF FACT

### A.    Introduction

1.    Names and Numbers is a Kansas corporation conducting business across the United States, including in Coconino County, Gila County, Graham County, Greenlee County, Mohave County, and Yavapai County, Arizona, and across 16 other states.

2.    Names and Numbers publishes local business directories in the U.S. and Canada.

3.    Names and Numbers has offered its customers options to buy advertising that is print, print and digital, or solely digital.

4.    Names and Numbers advertises online that its mission is to "connect buyers and sellers through [its] print, digital and mobile products" and that, since 1974, its "job has been to

bring your business more business."

5.    Defendant Arvig Enterprises, Inc. dba Arvig Media ("Arvig Media") is a Minnesota corporation conducting advertising business in, upon information and belief, Coconino County, Gila County, Graham County, Greenlee County, Mohave County, and Yavapai County, Arizona, and across other states including but not limited Idaho, Washington, and Oregon.

6.    Defendant Cydni Beck aka Cyd Beck ("Ms. Beck") was a former employee of Names and Numbers.

**B.    From Mr. McKnight's Testimony (Names and Numbers' President)**

7.    Names and Numbers hired Ms. Beck as a salesperson on October 21, 2022.

8.    Names and Numbers and Ms. Beck executed a Salesperson Employment Contract (hereinafter, the "Employment Contract" or, at times, the "Agreement"), to memorialize the terms of Ms. Beck's employment. (Compl. at ¶ 13 and Exh. A).

9.    The Employment Contract's recitals expressly provide as follows:

> The Company is in a highly competitive business and expends a considerable amount of time, effort, and money in the development of business from new clients and customers, and in obtaining continued business from existing clients and customers.
> The Company has also developed and acquired for use certain commercially valuable information, technology, and business methods that are not generally available to or known by the public.
> The continued growth and success of the Company depends on its ability to maintain its competitive edge, and not only requires the protection of its existing proprietary information and technology, but also the generation of new proprietary information, technology and business methods. The Employee understands that the basis of the success of the Company resides in its employees, and is dependent upon the protection of its proprietary information, technology and business methods.

10.   Paragraph 1 of the Employment Contract ("Duties of Employee") states, among other things:

. . .

2

Employee hereby agrees to diligently and faithfully perform all duties required as a salesperson for Company.

The Employee's duties include but are not limited to the following:
   a. To solicit, secure, and maintain for Company local business directories and digital products advertising contracts.
   b. To complete and forward all contracts, copy sheets with appropriate art, etc. for local business directories and digital products advertising on forms as provided by Company.
   c. To devote best efforts exclusively in furtherance of Company's business on a full-time basis, and not to represent any other company without the specific prior written permission of Company.
   […]
   e. To faithfully and diligently discharge all other duties assigned by Company.
   f. To actively attend to the business needs of Company's customers within the territory assigned by Company and to attract and obtain new customers within said territory for Company. . . .

   11.    Paragraph 7 of the Employment Contract ("Non-Disclosure of Information") states, among other things:

Employee may have access to trade secrets, confidential and/or proprietary information of the Company, including but not limited to all information used by or belonging to or relating to the Company or any subsidiary, parent or affiliate of the Company which is not generally known to the public or to the industry in which the Company is or may become engaged, including, without limitation, past, present or future business or trade secrets, customers or customer lists, prospects or prospect lists, price lists, cost lists, methods, policies, formulas, procedures, know-how, manuals, handbooks, instructions, techniques, business strategies, marketing or development plans, devices, records, drawings, demonstrations, samples, models, blueprints, reports, specifications, designs, technology and digital products, computer hardware and software, key employees, financial or proprietary information and all other information, knowledge or data of any kind or character relating to the products or business of the Company or any subsidiary, parent or affiliate of the Company whether or not reduced to writing, which should be treated as confidential information, and all copies and duplications thereof ("Confidential Information"), some of which the Company may have licensed or otherwise acquired from third parties. Employee agrees that upon termination of employment with

the Company for any reason whatsoever, whether voluntary or involuntary, or whenever the Company shall request, he or she will promptly deliver to the Company all Confidential Information in his or her possession or under his or her control, and will not retain copies thereof. In addition, Employee agrees to treat all Confidential Information as confidential and will not during the term of employment or at any time subsequent to the termination of employment communicate or disclose to any person or entity, other than the Company, nor duplicate or use for any reason or purpose, either for the benefit of Employee or for the benefit of any person or entity, other than for the benefit of the Company, any Confidential Information. Employee further agrees to use best efforts at all times to safeguard any Confidential Information from falling into the hands of any unauthorized person or entity. . . .

12.    Paragraph 8 of the Employment Contract ("Non-Solicitation and Non-Disclosure") states, among other things:

For a period commencing on the date of this Agreement, continuing for a period of 24 months following the termination of Employee's employment or association with the Company for any reason whatsoever, whether voluntary or involuntary, Employee will not, directly or indirectly, or as an employee, officer, director, member, owner, stockholder (except for ownership in a company whose stock is actively traded on a national public exchange), agent, consultant, lender, or affiliate of such entity or otherwise:

  a.  Solicit, accept, or service, or attempt to solicit, accept or service, any business similar to the type and character of business then engaged in by the Company from any person, corporation or other entity who is then or during the term of employment was a customer or independent contractor of the Company . . . .

13.    Paragraph 9 of the Employment Contract ("Covenant Not to Compete") states, in full:

For a period of two years after termination of employment for any reason whatsoever, whether voluntary or involuntary, Employee hereby agrees that he or she will not, within any area covered by a local business directory (print and online) published by Company, and a radius of twenty-five (25) miles beyond such areas:

  A.  Own, operate, engage in, or cause to be operated or engaged in directly, indirectly or through others any Competitive Business; or
  B.  Disseminate or cause to be disseminated advertising material

4

related to any Competitive Business; or

C. Become interested in, directly or indirectly, as an employee partner, officer, director, stockholder, advisor, consultant, agent, independent contractor or any other form, method, or capacity, any Competitive Business; or

D. Shall not disparage, hold in disrepute, or otherwise speak or refer in negative terms about Employer.

For purposes of this Agreement, a "Competitive Business" means any business activity which involves or relates to publication of print or online local business directories and digital products, or solicitation of advertising therein, or which otherwise competes directly or indirectly with the business activities of Company.

The Employee represents that his or her experience, age, capabilities, health and personal assets are such that this covenant will not deprive Employee from either earning livelihood in the unrestricted business activities or from otherwise adequately and appropriately supporting himself or herself.

The parties further agree that the time period of this covenant and the geographic area covered are terms and conditions which are reasonable and necessary for the protection of the business activities and valuable property rights of Company.

14.   Paragraph 10 of the Employment Contract ("Disclosure of Agreement") states, in full: "Employee agrees to provide a copy of this Agreement any prospective future employer prior to accepting employment with any such employer."

15.   Paragraph 11 of the Employment Contract ("Remedies") states, in full:

The Company may enforce the terms of this Agreement by instituting legal or equitable action. Employee understands and agrees that in the event of a breach or threatened breach of any provision of this Agreement, the Company may suffer irreparable damages and its remedy at law will be inadequate. Therefore, upon any such breach or threatened breach by Employee, the Company shall be entitled to injunctive relief. Moreover, if the Company prevails against Employee, in whole or in part, in any action to enforce this Agreement, whether for injunctive relief or damages or both, then in addition to whatever injunctive relief or damages may be awarded, Company shall be entitled to all costs and expenses, including reasonable attorney fees and expert witness fees, incurred in connection with any dispute hereunder, whether or not formal litigation is commenced; and Employee shall be liable for such costs and expenses. It is further agreed that in the event a court of competent jurisdiction determines that Employee has breached any

obligations under paragraphs 7, 8, or 9, the expiration date of the covenants herein shall be extended by a day for each day the covenant(s) herein have been breached.

16.    Paragraph 13 of the Employment Contract ("Severability") states, in full: The invalidity or unenforceability of any part or subpart of this Agreement shall not affect the validity or enforceability of the remainder of the Agreement. If any provision of this Agreement shall be held to be excessively broad as to time, geography, activity or other obligations, it shall be construed or reformed, by limiting or reducing it, so as to be enforceable to the maximum extent in favor of the Company that is lawfully enforceable.

17.    Paragraph 16 of the Employment Contract ("Applicable Law") states, in full: This Agreement is deemed to be entered into in Pittsburg, Kansas and shall be construed pursuant to and governed by the laws of the State of Kansas. The parties agree that jurisdiction and venue in any action brought pursuant to this Agreement to enforce its terms shall properly lie in the District Court of Crawford County, Kansas. Such jurisdiction and venue is merely permissive; jurisdiction and venue shall also continue to lie in any court where jurisdiction and venue would otherwise be proper.

18.    Since the month of _____ in 2025, Ms. Beck's sales for Names and Numbers drastically dropped.

19.    As a result of her poor performance, Names and Numbers had Ms. Beck participate in Friday training sales representative sessions.

20.    As part of the Friday training sales representative sessions, Ms. Beck has access to all sales support materials and the Company's intranet with its proprietary information, including, but not limited to, Names and Numbers' rate card and previous years' customers' contracts.

21.    On February 5, 2025, Ms. Beck signed an independent contractor agreement with Arvig Media to "[s]ell directory and digital advertising" and paid her based on her sales of print and digital products. (Doc. 26 at 4:13-14 and Exhibit 3).

22.    At the time Arvig Media entered into an independent contractor agreement with Ms. Beck, it knew that she was employed by Names and Numbers to sell advertising in Arizona. (Doc. 26 at 4:13-14).

23.    In or around July 2025, Names and Numbers became aware that Ms. Beck was simultaneously working for Arvig Media in the advertising space, in violation of her Employment Contract and the spirit and purpose of the Employment Contract's recitals.

24.    Ms. Beck did not request written permission from Names and Numbers to represent or work for Arvig Media.

25.    Around that same time, Names and Numbers became aware that Ms. Beck was selling advertising for a competitor.

26.    Upon learning this information, Names and Numbers' president, Todd McKnight, called Ms. Beck to discuss her actions (she confirmed engaging in them) and to inform Ms. Beck that her actions were in violation of her Employment Contract.

27.    On July 22, 2025, Ms. Beck resigned from Names and Numbers by email and admitted that she was competing with Names and Numbers through Arvig Media.

28.    On July 24, 2025, Names and Numbers sent a letter to Arvig Media's Director of Business Development and Sales, Ms. Beck Schornack, and its Sales Manager, Rich Richter, informing them, in part, about Ms. Beck's obligations to Names and Numbers under the Employment Contract and her violations of the same. Compl. at Exh. D. The letter also demanded that Arvig Media "cease and desist from allowing any of its sales reps to propound false information" about Names and Numbers. Compl. at Exh. D at 13.

29.    Arvig Media did not respond to Names and Numbers' letter from July 24.

**C.    From Mr. Eckhoff's Testimony (Names and Numbers' Digital Support Specialist)**

30.    While she was employed by Names and Numbers and Arvig Media, Ms. Beck made intentionally false and misleading representations to existing and long-standing Names and Numbers customers by telling them, for example, that "Arvig bought Names & Numbers" (Doc 9, Exh. D), "[w]e have gone through another rebranding. We are not Arvig Media," (Doc 9, Exh. E), and "[t]he contractor [sic] reads Arvig as they have bought out Names And [sic] Numbers division," (Doc 9, Exh. G).

31.　While she was employed by Names and Numbers and Arvig Media, Ms. Beck sold print advertising to long-standing Names and Numbers customers.

32.　While she was employed by Names and Numbers and Arvig Media, Ms. Beck sold digital advertising to long-standing Names and Numbers' customers.

33.　While she was employed by Names and Numbers and Arvig Media, Ms. Beck had long-standing clients sign contracts with Arvig Media, thinking they were signing contracts with Names and Numbers.

34.　While she was employed by Names and Numbers and Arvig Media, Ms. Beck submitted canceled contracts from Names and Numbers' long-standing customers to Names and Numbers and lied about the reason for cancelation.

35.　While she was employed by Names and Numbers and Arvig Media, Ms. Beck sold advertising to long-standing Names and Numbers customers with Arvig Media for a fraction of the cost of the advertising that the customer had with Names and Numbers.

**D.　From Ms. Gruben's Testimony (Names and Numbers' District Sales Manager)**

36.　Names and Numbers conducts business in, among other states, Washington and Idaho.

37.　Arvig Media recently began conducting business in Washington and Idaho.

38.　Arvig Media has sales representatives in Washinton and Idaho.

39.　Tim Jones is an Arvig Representative that sells advertising in the Washington and Idaho regions.

40.　Amanda Gruben is a Names and Numbers representative that sells advertising in the Washington and Idaho regions.

41.　Tim Jones visited Names and Numbers' long-standing customers and told them that Amanda Gruben had retired and that he was replacing her.

42.　Tim Jones visited Names and Numbers' long-standing customers to sell them advertising with Arvig Media while using a Names and Numbers' directory.

43.　As a result of Tim Jones' unlawful actions, Names and Numbers has lost long-

standing customers.

44.     Names and Numbers' long-standing customers in Washington and Idaho have signed advertisement contracts with Arvig Media, thinking they are continuing their advertisement with Names and Numbers.

## II.    PROPOSED CONCLUSIONS OF LAW

45.     Names and Numbers and Arvig Media are businesses related to publication of print or online local business directories and digital products, or solicitation of advertising.

46.     Names and Numbers and Arvig Media compete directly with each other in the advertising space.

47.     Ms. Beck breached her Employment Agreement with Names and Numbers.

48.     Ms. Beck made false and/or misleading representations to Names and Numbers' customers tending to induce them to believe that the advertising agreement they were signing was with Names and Numbers or a company that had bought Names and Numbers—Arvig Media.

49.     Ms. Beck's actions were contrary to honest practice in industry or commercial matters.

50.     Ms. Beck used knowledge, know-how, and/or Confidential Information (as defined in the Employment Agreement) regarding Names and Numbers' proprietary pricing to undercut Names and Numbers to its own customers.

51.     Ms. Beck's actions served to enrich her and Arvig Media.

52.     Ms. Beck's actions on Arvig Media's and on her own behalf served to unfairly compete with Names and Numbers.

53.     Arvig Media continues to contract with Ms. Beck in the advertising space.

54.     Ms. Beck has continued her violations of her Employment Agreement and her tortious conduct despite being on actual notice—as provided by Names and Numbers through phone calls, emails, demand letters, and court filings—that she is likely in violation of the same.

55.     Arvig Media has continued its unfair competition with Names and Numbers despite being on actual notice—as provided by Names and Numbers through demand letters and

court filings—that she is likely in violation of the same.

56.     Ms. Beck is not the only Arvig Media representative making false and/or misleading representations to Names and Numbers customers with an intent of inducing clients into believing they were contracting with Names and Numbers for advertising.

57.     In fact, Arvig Media's sales representatives, including Ms. Beck, have accelerated their efforts to unfairly compete with Names and Numbers in Arizona, Idaho, Oregon, and Washington after receiving actual notice of the likelihood of Defendants' liability for unfair competition and related claims.

58.     Arvig Media knew or should have known that Ms. Beck was selling to Names and Numbers' customers.

59.     Arvig Media was grossly negligent in retaining Ms. Beck.

60.     Arvig Media was grossly negligent in supervising Ms. Beck.

61.     Arvig Media is liable for its negligence in retaining and supervising Ms. Beck.

62.     Ms. Beck was and is an agent of Arvig Media.

63.     Arvig Media is liable for the unlawful conduct of its agent, Ms. Beck.

64.     Arvig Media is liable for the negligence of Ms. Beck because the duty not to commit fraud is nondelegable.

65.     Names and Numbers is likely to succeed on its claim for unfair competition against Ms. Beck and Arvig Media.

66.     Names and Numbers is likely to succeed on its claim for tortious interference with contract as against Ms. Beck and Arvig Media.

67.     Names and Numbers is likely to succeed on its claims for tortious interference with business expectancy as against Ms. Beck and Arvig Media.

68.     Names and Numbers has demonstrated that there are no serious questions going to the merits of its claims

69.     Names and Numbers will suffer irreparable harm absent injunctive relief.

70.     The balance of equities and public interest favor an injunction.

71.     The court exercises its discretion to set no bond.

THEREFORE:

Based on the foregoing, the court finds that Names and Numbers is entitled to a preliminary injunction as against Arvig Media and as against Ms. Beck in the forms lodged by Plaintiff.


Respectfully submitted on October 16, 2025.

**STINSON LLP**

By:   s/ *Jeffrey D. Harris*
Jeffrey D. Harris
Annabel Barraza
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004
*Attorneys for Plaintiff K.W. Brock*
   *Directories, Inc. aka Names and Numbers*