**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| K.W. Brock Directories Incorporated, | No. CV-25-08172-PCT-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Arvig Enterprises Incorporated, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff's Emergency Motion for Preliminary Injunction, where Plaintiff asks the Court to enjoin both defendants under Federal Rule of Civil Procedure 65. (Doc. 9.) The Motion is fully briefed, and the Court held a hearing. (Docs. 26, 31, 52, 59.) The Court will grant in part and deny in part the Motion (Doc. 9).

**I.    FACTUAL BACKGROUND**

Plaintiff K.W. Brock dba Numbers and Names ("N&N") and Defendant Arvig Media both sell advertising space in directories they publish. (Doc. 9 at 3-4.) N&N and Arvig provide print and digital advertising, but N&N plans to phase out print advertising in 2026. (Doc. 26 at 4.)

Defendant Cydni Beck began her employment with N&N as a salesperson on October 21, 2022. (Doc. 1-1 at 5.) Ms. Beck and N&N executed a salesperson employment contract (the "Employment Contract"), which memorialized the terms of Ms. Beck's employment. (*Id.* at 2-5; Doc. 1 ¶ 13.) Three of those terms are particularly relevant to the Motion (Doc. 9). First, Paragraph 7 ("Non-Disclosure of Information") prohibits Ms.

Beck's disclosure or use of N&N's proprietary information. (Doc. 1-1 at 3.) Paragraph 8 ("Non-Solicitation and Non-Disclosure") forbids soliciting or accepting business from N&N customers if that business is similar to N&N's. (Doc. 1-1 at 3-4.) Finally, Paragraph 9 ("Covenant Not to Compete") bars Ms. Beck from engaging in a "Competitive Business," defined as "any business activity which involves or relates to publication of print or online local business directories and digital products, or solicitation of advertising therein." (Doc. 1-1 at 4.)

Notwithstanding her employment with N&N, Ms. Beck signed an independent contractor agreement with Arvig on February 6, 2025. (Doc. 26-1 at 16-20.) According to Ms. Beck, while she was employed by both companies, she would make two pitches to potential customers: a print advertising contract with Arvig and a digital advertising contract with N&N. (Doc. 1-1 at 7.) Ms. Beck's justification is that N&N provides only digital advertising. (*Id.*) Based on N&N's communications with its customers, N&N learned that Ms. Beck had made misrepresentations to N&N customers. (Docs. 31-1, 31-4.) For example, she told customers that N&N had been purchased by Arvig. (Docs. 31-1, 31-4.) Customers opted to contract with Arvig. (Doc. 31-1.) Five months later, N&N learned about Ms. Beck's contemporaneous employment and terminated her employment with N&N on July 22, 2025. (Doc. 9 at 4, 6.)

## II.     PROCEDURAL BACKGROUND

On August 20, 2025, N&N filed suit against Ms. Beck and Arvig. N&N alleges that Ms. Beck, in association with Arvig, used and continues to use N&N's customer list, pricing information, and other proprietary information to induce N&N customers to contract with Arvig. (Doc. 1 at ¶¶ 33-57.) The first set of N&N's claims arise out of the Employment Contract's non-disclosure, non-solicitation, and non-compete clauses. (Doc. 1-1 at 3-4.) Against Ms. Beck, the Complaint alleges breach of contract, bad faith, and breach of fiduciary duties. (Doc. 1 ¶¶ 58-74.) The remaining claims are advanced against Ms. Beck and Arvig, based generally on Ms. Beck siphoning business from N&N to Arvig. (Doc. 1 ¶¶ 82-147.) Those claims include unfair competition, breach of fiduciary

1  duties, interference of contract, interference with business expectancy, racketeering, civil
2  conspiracy, fraud, and aiding and abetting tortious conduct. (*Id.*)

3  On August 25, 2025—five days after filing the Complaint (Doc. 1)—N&N filed its
4  Emergency Motion for Preliminary Injunction before the Court. (Doc. 9.) Defendants had
5  not been served, so the Court denied the emergency nature of the motion (Doc. 15), and
6  the Court set a hearing (Doc. 9). Arvig filed a Motion to Dismiss (Doc. 27), which is
7  pending, and a response to N&N's motion for a preliminary injunction (Doc. 26). N&N
8  filed a reply in support of its motion. (Doc. 31.)

9  Ms. Beck joined the case much later than Arvig. On October 7, 2025, the Clerk of
10 Court entered default as to Ms. Beck. (Doc. 28.) Ms. Beck subsequently filed an answer
11 (Doc. 29), a motion to set aside default (Doc. 33), and a response to N&N's motion for a
12 preliminary injunction (Doc. 52). All parties presented arguments and evidence during a
13 hearing on N&N's motion for a preliminary injunction. (Doc. 59.)

14 **III.    LEGAL STANDARD**

15 A party facing irreparable harm prior to the conclusion of litigation may ask a court
16 to grant a temporary restraining order or preliminary injunctive relief. Fed. R. Civ. P. 65.
17 "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*
18 *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a court to issue a preliminary
19 injunction, the movant "must establish that he is likely to succeed on the merits, that he is
20 likely to suffer irreparable harm in the absence of preliminary relief, that the balance of
21 equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking*
22 *Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*,
23 555 U.S. at 20).

24 **IV.    ANALYSIS**

25 N&N seeks an injunction against both defendants. (Doc. 9.) Because N&N's claims
26 and requested relief differ as to each defendant, the Court addresses the *Winter* factors for
27 each defendant in turn.

28 . . .

### A. Defendant Cydni Beck

#### 1. Likelihood of Success on the Merits

##### a. Breach of Contract

N&N asserts a breach of contract claim against only Ms. Beck. (Doc. 1 ¶¶ 58-81.) The Employment Contract contains several key provisions. Paragraph 7 ("Non-Disclosure of Information") states that Ms. Beck:

> "may have access to trade secrets, confidential and/or proprietary information" and "agrees to treat all Confidential Information as confidential and will not during the term of employment or at any time subsequent to the termination of employment communicate or disclose . . . nor duplicate or use for any reason or purpose . . . other than for the benefit of [Names and Numbers], any Confidential Information."

(Doc. 1-1 at 3.)

Paragraph 8 ("Non-Solicitation and Non-Disclosure) restricts Ms. Beck from:
> "[s]oliciting, accept[ing], or service[ing] or attempt[ing] to solicit, accept, or service, any business similar" to N&N's business "who is then or during the term of employment was a customer or independent contractor of" N&N for 24 months following Ms. Beck's termination.

(Doc. 1-1 at 3-4.)

Paragraph 9 ("Covenant Not to Compete") provides that for a period of two years after her termination, Ms. Beck will not:
> "engage in, or cause to be operated or engaged in directly, indirectly or through others any Competitive Business, or [d]isseminate or cause to be disseminated advertising material related to any Competitive Business" "within any area covered by [Names and Numbers'] local business directory (print and online) . . . , and a radius of twenty-five (25) miles beyond such areas." "'Competitive Business' means any business activity which involves or relates to publication of print or

>online local business directories and digital products, or solicitation of advertising . . . ."

(Doc. 1-1 at 4.)

N&N alleges that Ms. Beck breached all of these provisions.

According to its terms, the Employment Contract is governed by Kansas law. (Doc. 1-1 at 5.) To succeed on a breach of contract claim, N&N must prove "(1) execution and existence of the contract alleged in the petition; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) the defendant's breach insofar as such matters are in issue." *DeHaemers v. DeHaemers*, 2016 WL 3031248, at *4 (Kan. Ct. App. May 27, 2016) (internal citation omitted). Here, N&N and Ms. Beck executed the Employment Contract on October 21, 2022 (Doc. 1-1 at 5), Ms. Beck was offered employment in exchange for a salary (*Id.* at 2-3), and N&N paid Ms. Beck for her employment (Doc. 1 ¶ 60). The remaining question is whether Ms. Beck breached the above provisions.

The record indicates that Ms. Beck did what the Employment Contract forbids: use N&N's confidential information, solicit business from N&N customers, and engage in competitive business. (Doc. 1-1 at 3-4.) The record is replete with exhibits showing that Ms. Beck solicited sales from N&N customers. For example, according to Ms. Beck herself, she would sell Arvig's print advertising service simultaneously with N&N's digital advertising—having customers sign a contract with Arvig, then leaving an N&N business card on top of the contract "in case they reconsidered." (*Id.* at 7.) There have been multiple instances where customers believed they had signed a contract with N&N, when they had actually signed a contract with Arvig. (*See, e.g.*, Docs. 31-4, 31-6.) N&N presents evidence that Ms. Beck renewed less than a third of her sales with N&N, suggesting that Ms. Beck used N&N's confidential information, namely their customer list, to siphon customers on behalf of Arvig. (Doc. 1 ¶ 52.)

Ms. Beck raises two arguments. First, she challenges the enforceability of the Employment Contract on the basis that N&N altered the terms of the contract without

executing a new agreement. (Doc. 52 at 2.) At oral argument, counsel for Ms. Beck argued N&N originally contracted for Ms. Beck to sell print and digital advertising, but N&N altered those terms when it decided to sell only digital products. (Doc. 59.) The Employment Contract executed by Ms. Beck states that Ms. Beck "agrees to . . . perform all duties required as a salesperson," which includes "solicit[ing], secur[ing], and maintain[ing] for [Names and Numbers] local business directories and *digital* products advertising contracts." (Doc. 1-1 at 2) (emphasis added). Regardless of whether N&N decided to exclusively focus on digital advertising, the terms of the contract remained the same. Under the Employment Contract, Ms. Beck's duties always included selling digital advertising, and nothing in the agreement signed by Ms. Beck guaranteed the continuation of any particular mix of print and digital advertising. (*Id.*) There were no post-execution alterations to the Employment Contract, so the contract is enforceable.

Second, Ms. Beck asserts that she did not violate the Covenant Not to Compete because she never engaged in a "competitive business." (Doc. 52 at 2-3.) Ms. Beck points out that she sold only print advertising through Arvig and digital advertising through N&N. (Doc. 52 at 2.) But the Covenant Not to Compete bars Ms. Beck from engaging in any "competitive business," defined as "any business activity which involves or relates to publication of print *or* online local business directories and digital products." (Doc. 1-1 at 4) (emphasis added). The terms of the contract are unambiguous. Even if Ms. Beck sold only print advertisements through Arvig, N&N and Arvig are ultimately competing for the same marketing dollars. Potential customers choose between print and digital advertising, or some combination of both. To the extent Ms. Beck sold Arvig contracts to customers, she was in direct competition with N&N in breach of the Employment Agreement.

N&N has made a showing that it is likely to succeed on its breach of contract claim.

   **b. Unfair Competition**

N&N alleges that Ms. Beck unfairly competed with N&N by "palming off," which is "false representation tending to induce buyers to believe that defendant's product is that of the plaintiff." (Doc. 1 ¶¶ 82-88); *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 124,

956 (App. 1998) (internal citations omitted). N&N presents evidence that Ms. Beck made misrepresentations to customers about who the customers were contracting with. For example, customers reported that Ms. Beck stated N&N had been purchased, causing customers to believe that they were renewing their contract with N&N when they were really signing a new contract with Arvig. (*See, e.g.,* Doc. 31-4.) When a customer signed a contract with Arvig, Ms. Beck would put an N&N business card on top. (Doc. 1-1 at 7.) Because Ms. Beck's representations would cause buyers to believe that Arvig's product is that of N&N's, N&N is likely to succeed on their unfair competition claim as to Ms. Beck.

### c. Interference with Contract and Business Expectancy

N&N brings claims for interference with contract and interference with business expectancy. (Doc. 1 ¶¶ 89-96, 105-12.) The standards for these claims are virtually identical—the former involves the interference of N&N's contractual relationships, while the latter deals with the interference of N&N's prospective economic relationships. N&N must establish: (1) the existence of a valid contract, relationship, or business expectancy; (2) knowledge of the contract, relationship, or business expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach; (4) resultant damage to the party whose contract, relationship, and business expectancy has been disrupted; and (5) improper action on the part of the interfering party. *ABCDW LLC v. Banning*, 241 Ariz. 427, 437 (App. 2016) (articulating the standard for tortious interference); *Dube v. Likins*, 216 Ariz. 406, 411 (App. 2007) (providing the standard for interference with business expectancy).

All of these factors are met. Ms. Beck knew about N&N's contracts and customer relationships because she developed N&N's relationship with its customers and facilitated contract acquisitions and renewals. (Doc. 1-1 at 2.) Again, N&N presents evidence that shows Ms. Beck solicited sales from N&N customers and induced them to sign contracts with Arvig. *Supra* Section 4.A.1.a., b. The resultant damage to N&N is the loss of business and relationships with their customers, as evidenced by the cancellation of contracts. (Doc. 1 ¶ 45.) N&N is likely to succeed on its claims.

### 2.     **Irreparable Harm**

N&N argues that Ms. Beck is irreparably damaging N&N's reputation and goodwill with its customers. (Doc. 31 at 11-13.) A loss of customers and goodwill constitutes irreparable harm. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (noting "that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *see also Aitkin v. USI Ins. Servs., LLC*, 2022 WL 1439128, at *2 (9th Cir. May 6, 2022). But that irreparable harm must be likely. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013). Since this case involves a breach of a non-competition agreement, the Court's decision turns on whether Ms. Beck is actively soliciting N&N customers. *Forefront Dermatology S.C. v. Crossman*, 642 F.Supp.3d 947, 952-53 (D. Ariz. 2022) (finding, in a case involving a nurse practitioner's breach of a non-competition agreement, no irreparable harm where Plaintiff failed "to establish [the defendant was] actively soliciting patients").

N&N identifies specific customers that Ms. Beck diverted away from N&N through misrepresentations. (Doc. 1 ¶ 45.) N&N also demonstrates that Ms. Beck has continued to siphon specific customers from N&N through at least September 24, 2025. (Doc. 31-1 at 1-8.) N&N has made a sufficient showing that Ms. Beck is continuing to actively solicit N&N customers, therefore causing irreparable harm to N&N.

### 3.     **Balance of Equities**

Courts must balance the competing hardships to the parties as a result of granting or withholding injunctive relief. *Winter*, 555 U.S. at 24. The hardship N&N faces absent an injunction would be the loss of control over its confidential information and the dilution of its goodwill. In contrast, an injunction against Ms. Beck would compel her to comply with the contractual obligations she undertook when she signed the Employment Agreement. Courts recognize "the long-settled principle that harm caused by illegal conduct does not merit significant equitable protection." *Disney Enter., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017); *see also Sr. Ozzy's Franchising LLC v. Morales*, 2023 WL 2601258,

at *3 (D. Ariz. Mar. 22, 2023) ("Defendants will not be irreparably harmed by a preliminary injunction as the injunction will only compel Defendants to comply with its contractual obligations") (internal citations omitted). The balance of equities tips in favor of N&N.

### 4. Public Interest

For the same reason, it is in the public interest to enjoin Ms. Beck. "It is generally in the public interest to enforce valid contracts and make sure parties live up to their agreements." *ReBath LLC v. New England Bath Inc.*, 2016 WL 8670165, at *6 (D. Ariz. Oct. 24, 2019) (internal citation omitted). Further, courts find that the injunctive relief is in the public interest when an injunction protects trade secrets and confidential information. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). Because an injunction would enforce Ms. Beck's contractual obligations and protect N&N's confidential information, an injunction is in the public interest.

All *Winter* factors are met, so an injunction against Ms. Beck is appropriate.

### B. Defendant Arvig Enterprises

#### 1. Likelihood of Success on the Merits

##### a. Vicarious Liability

N&N alleges several claims against Arvig, including unfair competition and interference with contract, all stemming from Ms. Beck and Arvig representatives' siphoning of business away from N&N to Arvig. (Doc. 1 ¶¶ 89-147.) Arvig contests liability under all claims because Ms. Beck was retained as an independent contractor and Arvig had no right to control Ms. Beck. (Doc. 26 at 7.) N&N counters that Ms. Beck is Arvig's agent under the doctrines of apparent authority and non-delegable duties. (Doc. 31 at 8-9.) N&N recites the applicable legal standards for these theories but does not provide any evidentiary support. (*Id.*) For example, N&N cites cases holding an employer liable where the employer "knows of and sanctions illegal conduct," yet N&N provides no evidence that Arvig knew about or ratified Ms. Beck's conduct. (*Id.*) As the record stands, the only document that clearly speaks to Ms. Beck's relationship with Arvig is Ms. Beck and Arvig's independent contractor agreement, which states, "the Contractor is acting as

an independent contractor and not as an employee." (Doc. 26-1 at 18.)

As for allegations related to other Arvig representatives, N&N presents exhibits showing internal N&N conversations about incidents where N&N lost business to Arvig because of purported misrepresentations by Arvig representatives. (Doc. 31-1.) The majority of those instances involved Ms. Beck, and the majority of the remaining instances involved one Arvig representative, Tim Jones. (*Id.*) N&N has presented no evidence that Arvig ever sanctioned these representatives' conduct or authorized them to hold themselves out as an agent to third parties, as required to establish an agency relationship. *Miller v. Mason McDuffe Co. of S. Cal.*, 153 Ariz. 585, 590 (1987). N&N has not clearly shown that an agency relationship exists between Arvig, Ms. Beck, and the Arvig representatives. N&N cannot rely on the doctrine of *respondeat superior* as a basis for liability.

### b.     Negligent Hiring

Still, N&N asserts Arvig is directly liable because Arvig negligently hired Ms. Beck. (Doc. 31 at 8.) N&N alleges that Arvig knew or should have known of Ms. Beck's Employment Contract with N&N. (*Id.* at 8.) Under Arizona law, an employer is liable under a theory of negligent hiring if an employee's negligence was foreseeable at the time the employer selected the employee. *Pruitt v. Pavelin*, 141 Ariz. 195, 202 (App. 1984) (holding that "[a]n employer will not be liable for an act of an employee that was not foreseeable"). For example, when a real estate agent committed fraud against a plaintiff, the employer was found liable for negligent hiring because the employer knew the employee had previously forged a signature, been convicted of passing insufficient fund checks, and lied about obtaining a license. *Id.* at 202-03.

For N&N to prevail on a theory of negligent hiring, it must prove that it was foreseeable Ms. Beck would engage in the misconduct N&N alleges. While N&N nakedly alleges that Arvig did know or should have known of Ms. Beck's Employment Contract (Doc. 31 at 8), it has not presented sufficient evidence suggesting that it was foreseeable Ms. Beck would exploit confidential information to divert business from N&N. N&N has not demonstrated that Arvig would be liable under a theory of negligent hiring.

N&N has not made a clear showing that it is likely to succeed on the merits of its claims against Arvig.

### 2.     Irreparable Harm

N&N alleges that Arvig will cause irreparable harm by damaging N&N's relationship with its customers. (Doc. 31 at 11-13.) Again, a loss of customers and goodwill constitutes irreparable harm, but N&N must also demonstrate that the harm is likely. *Rent-A-Ctr.,* 944 F.2d at 603; *Aitkin*, 2022 WL 1439128, at *2; *Herb Reed*, 736 F.3d at 1251. N&N's evidence demonstrates misconduct by Ms. Beck and a handful of Arvig representatives. (Doc. 31-1.) But N&N fails to show that Arvig itself is likely to cause irreparable harm absent an injunction. Notwithstanding purported misconduct by Ms. Beck and Arvig representatives, unless N&N prevails under a theory of vicarious liability, N&N cannot establish Arvig itself is responsible for the misuse of N&N's confidential information that N&N is asking the Court to enjoin. As explained above, N&N has not sufficiently shown a likelihood of success under a theory of vicarious liability, so N&N has not made a clear showing that Arvig is likely to cause irreparable harm absent an injunction.

### 3.     Balance of Equities

An injunction would not expose Arvig to significant hardship. In N&N's original motion for preliminary injunction, N&N asked the Court to enjoin Arvig from soliciting or accepting business from N&N's customers for two years. (Doc. 9-8 at 2.) But N&N now requests a narrower injunction against Arvig, enjoining Arvig from using N&N's confidential information and making misrepresentations or negative statements about N&N to N&N's customers. (Doc. 31-29 at 2.) As written, the injunction would impose virtually no burden on Arvig, since Arvig claims it does not possess any of N&N's confidential information. The only hardship Arvig identifies from N&N's current proposal is that enjoining Arvig from making "negative" statements would prevent Arvig from making truthful, critical statements about N&N. (Doc. 26 at 10.) Even so, that is trivial in comparison to N&N's loss of business. The balance of equities tips in favor of N&N.

### 4. Public Interest

It would also be in the public interest to enjoin Arvig. The public interest favors injunctions protecting confidential information. *Kewanee Oil*, 416 U.S. at 481. Arvig argues that an injunction would hamper its ability to engage in fair competition. (Doc. 26 at 11); s*ee TDBBS LLC v. Ethical Prods. Inc.*, 2019 WL 979944, at *6 (D. Ariz. Feb. 28, 2019) ("[A]n improperly-issued injunction would undermine the public's interest in promoting free market competition"). But Arvig raised that argument against N&N's initial proposed order, which would have barred Arvig from soliciting or accepting business from N&N customers for two years (Doc. 9-8), and N&N's new proposed order would enjoin Arvig from using confidential information and making misrepresentations and negative statements about N&N (Doc. 31-29). As written, the recommended injunction against Arvig would serve the public interest since it protects N&N's confidential information with little impact on Arvig's ability to continue soliciting customers.

Still, N&N's failure to satisfy all *Winter* factors makes injunctive relief against Arvig inappropriate.

## V. BOND

The Court has discretion to set a bond upon issuing an injunction to compensate the subject of an injunction in the event the injunction is wrongfully issue. Fed. R. Civ. P. 65(c). If the injunction is wrongfully issued, the bond is meant to compensate Defendants for lost income. Ms. Beck will be enjoined from soliciting business in accordance with the Employment Contract, so the bond amount should account for her lost income. Ms. Beck reported on her 2024 W-2 that her income was $133,941.57. (Doc. 36-6.) A bond amount of $75,000 is sufficient to compensate Ms. Beck for her lost income, given that any loss will be offset by Ms. Beck securing employment elsewhere during the injunction period.

## VI. CONCLUSION

With respect to Ms. Beck, N&N has made a clear showing that all four *Winter* factors have been met. The Court will grant N&N's request to enjoin Ms. Beck.

N&N has not made a clear showing that an injunction against Arvig is warranted. Although the balance of equities and public interest prongs of the *Winter* standard are met, when a movant is unable to show a likelihood of success on the merits, the remaining three factors need not be considered. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). Because N&N has failed to demonstrate a likelihood of success on the merits, the Court will deny injunctive relief as to Arvig.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion (Doc. 9) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that pursuant to Federal Rule of Civil Procedure 65, Defendant Beck, is enjoined during the pendency of this litigation from:

1. Using, disclosing, copying, or divulging Plaintiff's Confidential Information in Defendant Beck's possession or control for any purpose. Confidential Information includes trade secrets, confidential and/or proprietary information obtained from Plaintiff or any subsidiary, parent, or affiliate of Plaintiff, including information used by or belonging to Plaintiff which is not generally known to the public, including, but not limited to, business or trade secrets, customer lists, prospect lists, price lists, cost lists, methods, policies, know-how, manuals, business strategies, and all other information, knowledge, or data of any kind obtained from Plaintiff. Confidential Information does not include information that is publicly available, independently developed by Defendant Beck without use of Plaintiff's confidential materials, or derived solely from Defendant Beck's general knowledge, skill, and experience;

2. Making any false representation to any of Plaintiff's current customers or falsely representing, negligently representing, and/or purposefully omitting material information to Plaintiff's current customers;

3. Soliciting, assisting in the solicitation of, accepting, or advertising to any current customer of Plaintiff, as of July 23, 2025; and

1. 4. Carrying on or engaging in any business that competes with Plaintiff's advertisement business, including any business activity that relates to publication of print or online local business directories, in any area covered by a Names and Numbers local business directory in the state of Arizona, and a radius of twenty-five (25) miles beyond such areas.

**IT IS FURTHER ORDERED** that this order is binding on (1) Defendant Beck, (2) Defendant Beck's officers, agents, servants, employees, and attorneys, and (3) other persons wo are in active concert or participation with anyone as described in (1) or (2). *See* Fed. R. Civ. P. 65(d)(2).

**IT IS FINALLY ORDERED** lifting the October 23, 2025, Temporary Restraining Order (Doc. 58).

Dated this 29th day of October, 2025.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge